# UNITED STATES v. NATIONAL EXCHANGE BANK OF PROVIDENCE.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE FIRST CIRCUIT.

No. 90. Argued January 25, 26, 1909.—Decided June 1, 1909.

The United States can recover from a bank presenting pension checks to, and receiving the money therefor from, a sub-treasury, where the names of the payees have been forged; and the right to recover is not conditioned upon either demand or the giving of notice of the discovery of facts which by the operation of the legal warranty were presumably within the knowledge of the bank.

The United States is not chargeable with the knowledge of the signa-

tures of the vast numbers of persons entitled to receive pensions, and the exceptional rule as to certain classes of commercial paper that the person having knowledge of the genuine signature of the payee whose signature is forged is negligent in paying on such an indorsement and therefore cannot recover, does not apply to the United States in regard to pension checks. *Leather Manufacturers' Bank* v. *Merchants' National Bank,* 128 U. S. 26, approving *White* v. *Continental National Bank,* 64 N. Y. 316, followed.

*Quære* and not decided whether government pension checks are not official warrants, but checks, and, as such, subject to the general rules of commercial paper as between private parties.

151 Fed. Rep. 402, reversed.

THIS action was brought by the United States to recover the sum of payments made at the sub-treasury in Boston upon 194 pension checks, the signatures or marks of the persons to whom the checks were payable having been forged. The National Exchange Bank of Boston was originally sole defendant, but in legal effect the National Exchange Bank of Providence was substituted as defendant, and the issues were made up between it and the United States. We shall hereafter refer to that bank as the Exchange Bank.

The cause was tried upon an agreed statement and the material facts may be thus summarized:

Upon receipt of pension vouchers, regular in form and purporting to be executed by the pensioners named therein—but which in fact were forgeries—the United States pension agent at Boston drew the checks in question upon the sub-treasury at Boston, aggregating $6,362.07, in favor of the pensioners named in the vouchers, and transmitted such checks by mail directly to the address of each pensioner as given in the vouchers, in accordance with the provision of § 4765, Rev. Stat. Of the persons named in the checks fifteen had died, and the others were the widows of soldiers who had remarried, and whose right to a pension had ceased, all the names, however, as we have said, having been forged. With but two exceptions the checks were either for $24 or $36.

The checks with the forged indorsements thereon of the

payees were cashed by the Exchange Bank, and immediately indorsed to a national bank in Boston for collection. The checks were presented by the collecting bank at the subtreasury of the United States in Boston. The collecting bank received payment of the same and accounted for such payment to the Exchange Bank.[1]

In May, 1897, a special examiner of the Pension Bureau was detailed at Providence to investigate the case of one Mooy, a deceased pensioner, in whose name three of the checks here in question, each for $36.00, had been issued and paid in 1896. On June 18, 1897, the examiner reported to the bureau the forgery of the name of the deceased payee, and that it had probably been done by one William A. Munson. December 18, 1897, notice was given to the Exchange Bank by the United States attorney at Providence that the indorsements of Mooy's name to said checks were forged, and that at a proper time reclamation would be made for the money paid to the bank upon the checks. The remaining forgeries were discovered at different times during the months of February, March, April and May, 1898, and in December, 1898, Munson, who was undergoing imprisonment upon a sentence imposed June 22, 1898, for forging a pension check, with which presumably this case is not concerned, admitted that he had forged the signatures of the payees on the checks in suit.

---

[1] The payments were made as follows:

During 1886, 1887 and 1888, five checks, each for $36.00, were paid on account of pension certificate issued in name of Martha Crampton ..................................................... $180 00

| During | 1892............................................ | $334 80 | |
| | 1893............................................ | 867 27 | |
| | 1894............................................ | 1,092 00 | |
| | 1895............................................ | 1,380 00 | |
| | 1896............................................ | 1,620 00 | |
| | 1897............................................ | 888 00 | |
| | | | 6,182 07 |

$6,362 07

On July 22, 1898, the United States attorney at Providence made written demand upon the Exchange Bank to be refunded the sums paid, except as to checks aggregating $351.27, for which no demand for repayment was made other than by the bringing of this action. The bank refusing to repay, this action was commenced on August 27, 1901.

Each of the 194 checks was made the subject of two counts. An indebtedness of the defendant bank to the United States was averred in the first count to have arisen from the fact that a described check had been lawfully issued by a United States pension agent, drawn upon the Assistant Treasurer of the United States, that a signature, purporting to be that of the payee, was thereafter forged upon the check, and that the Exchange Bank indorsed said check and presented it for payment to the Assistant Treasurer, who paid the amount thereof. The second count was the common count for money received by the defendant to the use of the United States. In substance, the defenses interposed in the answer of the bank were that if the facts averred in the declaration were established by the proof, the bank was yet not liable, because the action had not been brought within a reasonable time after the alleged payments of the drafts, nor had prompt notice been given of the discovery of the forgeries. It was also averred that the United States had been negligent in not verifying the signatures of the payees of the checks in suits by comparing them with signatures of the payees in its possession.

Upon the agreed facts the Circuit Court entered judgment against the bank for the full amount claimed with interest. The appellate court, however, reversed this judgment, and remanded the cause with directions to enter judgment for the Exchange Bank (151 Fed. Rep. 402); and this writ of error was thereupon prosecuted.

*Mr. Assistant Attorney General Fowler,* for plaintiff in error, submitted:

The Government's right of action is not defeated by th

failure of its agents to give notice to defendant of the forged indorsements immediately upon the discovery thereof. The rule adopted by the Circuit Court of Appeals is not in accord with sound reasoning or with the weight of the authorities. *United States* v. *National Park Bank*, 6 Fed. Rep. 852; *United States* v. *Bank*, 13 D. C. Rep. 296; *United States* v. *Onondaga County Savings Bank*, 39 Fed. Rep. 259; *Cooke* v. *United States*, 91 U. S. 389, 402, 403; 5 Cyc. Law and Procedure, pp. 546, 547; *White* v. *Continental National Bank*, 64 N. Y. 316, 321, 322; 2 Daniel on Negotiable Instruments, § 1372.

The pension checks in question were not commercial paper in the strict sense of that term. *The Mayor* v. *Ray*, 19 Wall. 468, 477; *Wall* v. *County of Monroe*, 103 U. S. 74, 78; *Claiborne County* v. *Brooks*, 111 U. S. 400, 408; *District of Columbia* v. *Cornell*, 130 U. S. 655, 661; *Floyd-Acceptance Cases*, 7 Wall. 666, 676.

The Government of the United States cannot be bound by the laches of its officers in failing to give notice within proper time that the indorsements on the checks in question were forgeries.

The rule laid down in *United States* v. *Cooke*, Fed. Cas. No. 14,855, that when the Government becomes a party to a negotiable instrument, it is bound to take the same steps to perfect its rights as is an ordinary individual, does not apply in case the checks in question are not negotiable instruments. It should not be applied here, even if it be held that the checks are negotiable instruments, because, as heretofore shown, the Government's right of action does not depend upon the giving of notice to the defendant. If such notice were a necessary prerequisite to the bringing of the action, as is the fact of giving notice of the dishonor of commercial paper, the rule laid down in *United States* v. *Cooke* is a proper one. But where plaintiff's right of action exists, and the neglect to give notice can only be set up as a matter of defense, then it presents precisely the same question as any other act of negligence upon the part of the Government's officials.

*Mr. Theodore Francis Green* for defendant in error:

In case of a payment under a forged indorsement of commercial paper, the plaintiff, in order to recover, must have given notice of the forgery within a reasonable time after payment. This is clearly the rule in England. *Cocks* v. *Masterman,* 9 B. & C. 902 (1829); *Mather* v. *Lord Maidstone,* 18 C. B. 273, 294; *Wilkinson* v. *Johnson,* 3 B. & C. 428; *Smith* v. *Mercer,* 6 Taunt. 76.

To the same effect in general, see *Bloomer* v. *Spittle,* L. R. 13 Eq. 427 (1872); 2 Parsons, Notes and Bills, 598.

In the United States Federal courts also, a high degree of diligence has been required. *United States* v. *Cooke,* Fed. Cas. No. 14,855; *United States Bank* v. *Bank of Georgia,* 10 Wheat. 333.

Within the rule of the above cases an unreasonable time elapsed between the payment of the checks in this case, and the notice to the defendant of the forgery. The period varied from eighteen months, in the case of the Mooy checks to over eleven years in one instance, and averaged from two to five or six years.

In case of a payment under a forged indorsement of commercial paper, the plaintiff, to recover, must have given notice of the forgery within a reasonable time after its discovery. *United States Bank* v. *Bank of Georgia,* 10 Wheat. 344; *United States* v. *Clinton National Bank,* 28 Fed. Rep. 357; *United States* v. *Central National Bank of Philadelphia,* 6 Fed. Rep. 134; *United States* v. *National Exchange Bank,* 45 Fed. Rep. 163; *Gloucester Bank* v. *Salem Bank,* 17 Massachusetts, 33; *Raymond* v. *Baar,* 13 Serg. & Rawle (Pa.), 318; *Canal Bank* v. *Bank of Albany,* 1 Hill (N. Y.), 287; *Bank of Commerce* v. *Union Bank,* 3 Comst. (N. Y.) 230; *Ellis* v. *Ohio &c. Co.,* 4 Ohio St. 628, 657.

The Government contends that the true rule is, not that notice of a forgery must be given within a reasonable time of its discovery, but that the plaintiff may recover, no matter how long the delay, provided that it does not affirma-

tively appear that the defendant has suffered actual damage thereby.

That rule is laid down in a small number of cases, but it will be found upon analysis that in most of them notice of the forgery was in fact given shortly after its discovery, so that it was not necessary for the court to decide that unreasonable delay in giving notice was not fatal. For example, in *United States v. Onondaga County Savings Bank*, 39 Fed. Rep. 259; aff'd 64 Fed. Rep. 703, the forgery was discovered in two years, but notice was given to the defendant within three days thereafter. It was held that the plaintiff might recover.

Proof of damage by the delay in giving notice is not necessary. *United States v. National Exchange Bank*, 45 Fed. Rep. 163; *United States Bank v. Bank of Georgia*, 10 Wheat. 333; *Continental National Bank v. National Bank of the Commonwealth*, 50 N. Y. 575; *Raymond v. Baar*, 13 Serg. & Rawle (Pa.), 318; *Gloucester Bank v. Salem Bank*, 17 Massachusetts, 33, 46; *McNeely Co. v. Bank of North America*, 70 Atl. Rep. 891.

Pension checks are commercial paper. It is immaterial whether the instruments here involved are to be termed bills of exchange, drafts, checks or notes. They are in the ordinary form of a mercantile check, and it is enough that they have been held to be commercial paper by every court before which the question has come. In all the cases cited by the parties in their original briefs in the court below, whatever differences of opinion there may have been on the question of necessity of proof of damage, all the judges agreed that paper of the kind in question was negotiable. *United States v. Clinton National Bank*, 28 Fed. Rep. 357; *United States v. National Park Bank*, 6 Fed. Rep. 852; *United States v. Central National Bank*, 6 Fed. Rep. 134; *United States v. Onondaga Savings Bank*, 39 Fed. Rep. 259; *United States v. National Exchange Bank*, 45 Fed. Rep. 163; *United States v. Cooke*, Fed. Cas. No. 14,855; *Wells, Fargo & Company v. United States*, 45 Fed. Rep. 337, 340; *United States v. American Exchange Bank*, 70 Fed. Rep. 232;

*Bank of the Republic* v. *Millard*, 10 Wall. 152; *First National Bank* v. *Whitman*, 94 U. S. 343.

MR. JUSTICE WHITE, after making the foregoing statement, delivered the opinion of the court.

A preliminary matter needs to be noticed. In the opinion of the Circuit Court of Appeals it is said (italics ours):

"The precise form of only one of the so-called checks is shown by the record, as follows:

'United States·Pension Agency,           No. 297073.
      Boston, Mass., Mch 5 1892
Assistant Treasurer of the United States
      Boston, Mass.
  Pay to the order of Mahala B. Jaques          9492 B81
    Thirty-six              100 Dollars.     $36
    36                             Interior
                          W. H. OSBORNE,
                            *U. S. Pension Agent.*
Paid Mar. 12, 1892
      ASST. TREAS., *Boston.*
Indorsements:
                          MAHALA B. JAQUES
                                        *Payee.*
                          M. M. ANGELL
'Pay Nat. Bank of the Republic, Boston or order, for collection, for account of First National Bank, Providence, R. I.
                          C. E. LAPHAM,
                                        *Cashier.*
      Indorsement Guaranteed.
            Nat'l Bank of the Republic, Boston.'

'This is, however, understood to be a sample of the remaining checks. As they were drawn by the pension agent on the Assistant Treasurer of the United States, the question naturally arises whether, after all, they were anything more than official warrants, a question which we will turn to later. *It will*

*be observed, however, that no indorsement by the Exchange Bank appears on the sample shown in the record, and whatever indorsement there is is simply 'for collection.'"*

The sample check thus referred to is also set out in the opinion delivered in the Circuit Court. But no such check is in the record, nor is it embraced in the list of checks collected by the Exchange Bank, and for which recovery is sought by the United States. Presumably the stated sample check must have been inadvertently taken from the record in an action against some other bank. At all events, as it is not in argument questioned that the Exchange Bank was the holder of the checks sued for, when they were paid by the United States, we shall assume the correctness of the recital in the agreed statement of facts, that the checks "with the forged signatures thereon were cashed by the defendant, who immediately indorsed the said checks to a national bank in Boston for collection."

The Circuit Court of Appeals reversed the judgment in favor of the United States upon the ground that by the operation of an exceptional rule, said to prevail, under certain conditions, as to commercial paper, the United States could not recover for the mistaken payments, as there had been unreasonable delay in giving notice to the Exchange Bank after the discovery of the forgeries. The correctness of this action is assailed in the assignments of error, the Government contending that the pension checks in question were mere Treasury warrants, not commercial paper in the true sense of that term, and hence not controlled by the so-called exceptional commercial rule, but that even if the checks were commercial paper and governed by such rule mere negligent delay in giving notice of the discovery of the forgery would not prevent recovery, unless the Exchange Bank established by proof that it had thereby suffered damage. It is besides claimed that if the agents of the Government were negligent in giving notice of the discovery of the forgeries, their laches cannot be imputed to the United States. The Exchange Bank not only traverses

these assignments but insists that the claim of the United States to recover was rightfully rejected, because the duty was on it not only to give prompt notice of the discovery of the forgeries but also to discover the forgeries promptly after payment, a contention which is controverted by the Government.

In order to simplify the issue for decision we concede, for the sake of the argument only, that the forged instruments were not official warrants as contended by the Government, but in a generic sense are to be classed as negotiable commercial paper, and that in a case coming within the exceptional rule referred to the laches of the authorized agents of the Government can be imputed to it. But, assuming the instruments to be negotiable paper the question yet remains whether the right of the United States to recover from the Exchange Bank is controlled or limited by the exceptional rule referred to.

That in certain classes of cases an exceptional rule is enforced in England as to commercial paper, by which, under particular circumstances, such paper is taken out of the operation of the general rule relating to the recovery of money paid by mistake is not subject to question. *Price* v. *Neale*, 3 Burr. 1354; *Smith* v. *Chester*, 1 T. R. 654; *Smith* v. *Mercer*, 6 Taunt. 76; *Wilkinson* v. *Johnson*, 8 Barn. & Cresw. 428; *Cocks* v. *Masterson*, 9 Barn. & Cresw. 222. The decisions referred to, however, show that the exception was limited to cases where the person who paid a forged instrument and who sought recovery of the amount paid was charged with knowledge of the genuine signature of the person whose name was forged, and, therefore, was presumed to have been negligent in making the payment. For instance, where one accepted a draft purporting to be drawn upon him by a customer whose signature he was presumed to know, which afterwards turned out to be a forgery. Again, where a draft which purported to have been accepted, and by the seeming act of acceptance was made payable at a particular bank which paid the same for account of its customer, the apparent acceptor, and it afterwards turned

out that the acceptance was a forgery, the exceptional rule was applied.

Several of the English cases above cited were reviewed by this court in *Bank of the United States* v. *Bank of Georgia,* 10 Wheat. 333, 348, *et seq.* In that case recovery of moneys paid was denied to a bank which had received as genuine notes it had issued, but which had been fraudulently altered as to amount after being put in circulation, the decision having been rested (p. 353) "upon the broad ground that there was an acceptance of the notes as genuine, and that it falls directly within the authorities which govern the cases of acceptances of forged drafts." ·

The exceptional rule was thus noticed in the opinion delivered in *Cooke* v. *United States,* 91 U. S. 389, 396.

"It is, undoubtedly, also true, as a general rule of commercial law, that where one accepts forged paper purporting to be his own, and pays it to a holder for value, he cannot recall the payment. The operative fact in this rule is the acceptance, or more properly, perhaps, the adoption, of the paper as genuine by its apparent maker. Often the bare receipt of the paper, accompanied by payment, is equivalent to an adoption within the meaning of the rule; because, as every man is presumed to know his own signature and ought to detect its forgery by simple inspection, the examination which he can give when the demand upon him is made is all that the law considers necessary for his protection. He must repudiate as soon as he ought to have discovered the forgery, otherwise he will be regarded as accepting the paper. Unnecessary delay, under such circumstances, is unreasonable; and unreasonable delay is negligence, which throws the burden of the loss upon him who is guilty of it, rather than upon one who is not. The rule is thus well stated in *Gloucester Bank* v. *Salem Bank,* 17 Massachusetts, 45: 'The party receiving such notes must examine them as soon as he has opportunity, and return them immediately; if he does not, he is negligent; and negligence will defeat his action.'"

Although it has been considered that in later cases courts of England have mitigated the strictness of the exception upheld in the cases we have previously cited, and have made the right to recover back embraced in such cases depend somewhat upon the prejudice occasioned by the delay in giving notice (Chitty on Bills, 464), it is certain that the exception has not been extended so as to cause it to include a case like the one before us. *Imperial Bank of Canada* v. *Bank of Hamilton* (1903), A. C. 49. And, although the courts of some of the States of the Union have limited, restricted, or declined to follow the exceptional rule—see the subject reviewed in *Greenwald* v. *Ford* (1906), 21 S. Dak. 28, and *First National Bank* v. *Bank of Wyndmere* (1906), 15 N. Dak. 299—we have been cited to no decision of a court of last resort, involving a case like the one before us, where it was held that such a case is controlled by the exceptional rule. True it is a decision of the Supreme Court of New York, rendered in 1841 (*Canal Bank* v. *Bank of Albany*, 1 Hill, 287), involving analogous facts, has by some text-writers been treated as holding a doctrine which might be considered as establishing that the exceptional rule, as somewhat qualified by the decision in question, would be applicable to a case like the one before us. In the case referred to it was decided that where the bank upon which a draft was drawn paid it in ignorance of the fact that the supposed signature of the person to whom it was payable had been forged, it could not recover back the money without exercising reasonable diligence to give notice after the discovery of the forgery. We think, however, it is apparent that the court considered not that it was applying the exceptional rule, but that it was simply announcing its conception of the general principle as to the right to recover back money paid by mutual mistake. This is evident, since the court, after holding that the case before it was not governed by the exceptional rule, remarked that "where each party enjoys the same chance of knowledge, no case demands anything more than reasonable diligence in giving notice after the discovery of the forgery." No authority,

however, was cited on this proposition, nor was any intimation given by the court as to whether, even if there had been negligence in giving notice, recovery would not be permitted if no damage had been occasioned by the delay to the party to whom the payment had been made. A later case in New York enforced a principle which we deem applicable to the present controversy. The case is *White* v. *Continental Nat. Bank*, 64 N. Y. 316. The facts were these: A customer of the firm of White & Co. drew a draft on that firm for $27. After the delivery of the draft to the payee it was raised to the sum of $2,750. The raised draft came into the possession of the Continental National Bank of New York city, who took the same from a customer who was credited with and drew the amount. The Continental Bank presented the draft to White & Co., and that firm accepted the same, payable at the Leather Manufacturers' National Bank. When due the Leather Manufacturers' Bank paid the Continental Bank and debited the account of White & Co. This payment was made in August. Monthly accounts passed between White & Co. and its correspondent by whom the draft had been drawn, but the August account, which was rendered in the early part of September, was not examined. When the next account came along and was examined the alteration of the draft was discovered, and White & Co., evidently being bound to the Leather Manufacturers' Bank by the payment made by that bank at the request of White & Co. and for their account, notified the Continental Bank, demanded repayment, and on refusal brought suit to recover. The trial court enforced the exceptional rule and denied the right of White & Co. to recover. The Court of Appeals, while substantially conceding that if the forgery had been of the name of the drawer of the draft, White & Co., because of their presumed knowledge of such signature, would have been, by their acceptance, brought within the exceptional rule decided, that the rule was not applicable because the forgery concerned not the signature but the body of the draft, of which White & Co. were not presumed to have knowl-

edge. Thus eliminating the exceptional rule, the court held that as the Continental Bank had presented the forged draft for payment, and had under the principles of commercial liability at least impliedly warranted its genuineness, the bank was liable to repay to White & Co. · Although resting its conclusion upon the warranty on the part of the Continental National Bank of the genuineness of the instrument which it presented, the court, nevertheless, at the close of the opinion, observed (p. 322):

"But waiving the question as to the responsibility of the defendant for the genuineness of the instrument, and taking the most favorable view for the defendant, which is to regard it as a case of a mutual mistake, in respect to which neither was at fault, and in that view and upon that theory, the case is within the principles decided in *The Bank of Commerce* v. *The Union Bank* (3 Comst. 230); *The Kingston Bank* v. *Eltinge* (40 N. Y. 391)."

*White* v. *Continental National Bank* was cited and the doctrine therein expressed was approved and applied by this court in *Leather Mfrs. Nat. Bank* v. *Merchants' Nat. Bank*, 128 U. S. 26. The opinion in that case, delivered by Mr. Justice Gray, was announced on October 22, 1888, and was subsequent in date to several decisions of lower Federal courts cited in the opinion of the court below in this case, and which were deemed to conclusively demonstrate that the United States was not entitled to recover. In the *Leather Manufacturers' Bank case* the question for decision was thus stated in the opinion (p. 34):

"The question then is whether, if a bank, upon which a check is drawn, payable to a particular person or order, pays the amount of the check to one presenting it with a forged endorsement of the payee's name, both parties supposing the endorsement to be genuine, the right of action of the bank to recover back the money from the person so obtaining it accrues immediately upon the payment of the money, or only after a demand for its repayment."

The right of action was held to have accrued upon the pay-

ment of the money. After distinguishing the case from one which involved the relations of a bank and its depositors, the court said (p. 34):

"But as between the bank and the person obtaining money on a forged check or order, the case is quite different. The first step in bringing about the payment is the act of the holder of the check, in assuming and representing himself to have a right, which he has not, to receive the money. One who by presenting forged paper to a bank procures the payment of the amount thereof to him, even if he makes no express warranty, in law represents that the paper is genuine, and, if the payment is made in ignorance of the forgery, is liable to an action by the bank to recover back the money which, in equity and good conscience, has never ceased to be its property. It is not a case in which a consideration, which has once existed, fails by subsequent election or other act of either party, or of a third person; but there is never, at any stage of the transaction, any consideration for the payment. *Espy* v. *Bank of Cincinnati*, 18 Wall. 604; *Gurney* v. *Womersley*, 4 El. & Bl. 133; *Cabot Bank* v. *Morton*, 4 Gray, 156; *Aldrich* v. *Jackson*, 5 R. I. 218; *White* v. *Continental Nat. Bank*, 64 N. Y. 316.

"Whenever money is paid upon the representation of the receiver that he has either a certain title in property transferred in consideration of the payment, or a certain authority to receive the money paid, when, in fact, he has no such title or authority, then, although there be no fraud or intentional misrepresentation on his part, yet there is no consideration for the payment; and the money remains, in equity and good conscience, the property of the payer, and may be recovered back by him, without any previous demand, as money had and received to his use. His right of action accrues, and the statute of limitations begins to run, immediately upon the payment.

\*   \*   \*   \*   \*   \*   \*   \*

"In the case at bar, as in the case last cited, the plaintiff's right of action did not depend upon any express promise by

the defendant after the discovery of the mistake, or upon any demand by the plaintiff upon the defendant, or by the depositor or any other person upon the plaintiff; but it was to recover back the money, as paid without consideration, and had and received by the defendant to the plaintiff's use. That right accrued at the date of the payment, and was barred by the statute of limitations in six years from that date."

We are of the opinion that the case before us is directly within the principle governing the ruling made in the case just cited as well as within the doctrine of *White* v. *Continental National Bank,* which in effect, as we have shown, was approved by this court in *Leather Manufacturers' National Bank* v. *Merchants' Nat. Bank.* The United States is not before us as the acceptor of a draft drawn upon it and charged with knowledge of the signature of the drawer; nor was it a bank which had paid the check of a depositor and was charged with knowledge of the signature of such depositor. The forgery here was in the name of the payee, and it is therefore impossible, as it was in the case of *White* v. *The Continental Bank* and in the *Leather Manufacturers' Bank case,* to bring this cause within the exceptional rule without holding that the United States was charged with knowledge of the signatures of the vast multitude of persons who are entitled under the law to receive pensions. The exceptional rule as to certain classes of commercial paper proceeds upon an assumption of knowledge or duty to know, naturally arising from the situation of the parties, entirely consonant with their capabilities, and in accord with the common sense view of their relation. To apply the rule, however, to the Government and its duty in paying out the millions of pension claims, which are yearly discharged by means of checks, would require it to be assumed that that was known, or ought to have been known, which on the face of the situation was impossible to be known, would besides wholly disregard the relation between the parties and would also require that to be assumed which the obvious dictates of common sense make clear could not be truthfully assumed. But con-

clusive as are these considerations, the case does not alone depend upon them, since we think legislation of Congress in reason precludes the conception that it was contemplated that the United States (or its agents) had actual knowledge of the signatures of pensioners and in paying pensions was bound to all the world under such an assumption.

By §§ 4764 and 4765, Rev. Stat., it is required, before a pension check shall be issued, that vouchers shall be supplied, and the duty is cast upon the Secretary of the Interior of making rules and regulations to establish the identity of the pensioner. As shown by the record, the regulations thus promulgated require vouchers to be signed in duplicate before an officer authorized to administer an oath or before a fourth-class postmaster. The pensioner is required to exhibit his pension certificate to such officer and also to sign and make oath to a statement as to his identity; his existing right to the pension and his post office address. The officer is required to certify as to inspection of the pension certificate; that the pensioner was fully identified; that he had signed the duplicate receipts; and the address of the pensioner is to be stated in the certificate. These requirements are incompatible with the assumption that the Government was chargeable with knowledge of the identity, continued existence, and right to pensions, or with the signatures of those entitled to receive pension moneys. The requirement by the Government of proof, for its own protection, affords no ground for the contention that as to any action taken as the result of the furnishing of such proof the Government is estopped as to third parties from showing that the proofs furnished were false and fraudulent and that the Government had been deceived thereby. To so hold would be to say that from the act of exerting a precaution against fraud there arose a presumption by which the fraud could be successfully accomplished. This would be the case if it were now held that because by forged vouchers the Government was deceived into acting third parties had a right to rely upon the integrity of the proof and to estop the Government as though

representations as to the verity of such proof had been made by it to such third parties. The rights, therefore, of the bank as the apparent acquirer of the pension checks are to be governed by the nature and character of the instruments and cannot be enlarged so as to relieve the bank from the obligation of warranty implied in the presentation of the checks and the collecting of the amount. The subject is aptly illustrated in the opinion by Coxe, Judge, in *United States* v. *Onondaga County Savings Bank*, 39 Fed. Rep. 259, affirmed by the Circuit Court of Appeals for the Second Circuit in 64 Fed. Rep. 703.

As the nature of the forgery did not cause the case to be controlled by the exceptional rule, and as the Exchange Bank when it presented the checks and obtained thereon the money of the United States by operation of law warranted the genuineness of the instruments which it thus presented and upon which it asked and received payment, it follows that the case in substance is accurately portrayed in observations made by the Court of Appeals of New York in the *White case*, at pages 320–321:

"The facts which disentitled the defendant to receive the money, and in ignorance of which it was paid, were those presumed to be within the knowledge of the defendant and not of the plaintiffs. The defendant, in receiving the money and in disposing of it, did not act upon the faith of any admission by the plaintiffs, express or implied, of any fact which they now controvert in prosecuting this action. There was, therefore, no want of good faith, no negligence, or even want of ordinary care on the part of the plaintiffs in the payment of the money. The defendant, in the entire transaction, acted upon other evidence of its right to the money than the statement or actions of the plaintiffs, and in dealing with the bill and with the money, its avails, acted upon the apparent title and genuineness of the instrument, and the responsibility of those from and through whom it received the bill. The plaintiffs, therefore, owed no duty to the defendant in respect to the forgery,

which invalidated the bill and its title to the moneys represented by it."

Under these conditions the warranty of genuineness implied by the presentation and collection of the checks bearing the forged indorsement having been broken at the time the checks were cashed by the United States, and the cause of action having therefore then accrued, the right to sue to recover back from the Exchange Bank was not conditioned upon either demand or the giving of notice of the discovery of facts which by the operation of the legal warranty were presumably within the knowledge of the defendant.

The conclusion to which we have thus come renders it unnecessary to consider whether if the facts presented merely a case of mutual mistake, where neither party was in fault, and reasonable diligence was required to give notice of the discovery of the forgery if there was lack of such diligence, it would operate to bar recovery by the United States, although the Exchange Bank was not prejudiced by the delay.

The judgment of the Circuit Court of Appeals must be reversed and the judgment of the Circuit Court affirmed.

*And it is so ordered.*