## UNITED STATES v. FIRST NAT. BANK, ALBUQUERQUE, N. M.

### No. 2557.

Circuit Court of Appeals, Tenth Circuit.

Nov. 2, 1942.

986

Paul A. Sweeney, Atty., Department of Justice, of Washington, D. C. (Francis M. Shea, Asst. Atty. Gen., Everett M. Grantham, U. S. Atty., of Santa Fe, N. M., and K. Gill Shaffer, Asst. U. S. Atty., of Albuquerque, N. M., on the brief), for appellant.

Pearce C. Rodey, of Albuquerque, N. M., for appellee.

Before PHILLIPS, HUXMAN, and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

This appeal presents the question whether under these facts the United States, as drawer and drawee of a treasury check, can recover the amount of same upon the guaranteed endorsement of an endorsee bank, which has paid the proceeds of the check on the forged endorsement of an impostor, to whom the drawer delivered the same under the mistaken belief that the impostor was the true payee named in the check, and entitled to receive the same.

This action by the United States against the bank is based upon the following undisputed facts. Pursuant to the World War Adjusted Compensation Act, Act of May 19, 1924, 43 Stat. 121, 38 U.S.C.A. § 591 et seq., the director of the veterans bureau issued to Harry T. Goulding, a World War veteran residing in Arizona, adjusted service certificate No. 1351291.

By some means, apparently by theft, one Harry Wesley Ott came into possession of the said certificate, and representing himself to be Harry T. Goulding, the true owner of the certificate, Ott presented (apparently in person) the certificate, together with an application for a loan, to the veterans bureau at Albuquerque, New Mexico, as authorized by the World War Adjusted Compensation Act, supra, as amended March 3, 1927, 38 U.S.C.A. § 642, Subsections (i) to (m) incl., 44 Stat. 1389 and 46 Stat. 1429. In accordance with prescribed forms and regulations, Ott had been previously identified by a notary public for Bernalillo County, New Mexico, who attested on the prescribed form that "The person applying for the loan evidenced by the above note is known to be the veteran named in the adjusted service certificate referred to therein, and the signature on the above note is the signature of such veteran." [1] Relying upon such identification of Ott as the true owner of the certificate, Harry T. Goulding, the veterans' facility consummated the loan by accepting the certificate with the application for the loan, to which was appended a note in prescribed form, and by issuing a check for the amount of the authorized loan ($790.50), payable to the order of Harry T. Goulding, and delivering the same to Ott by mail addressed to Harry T. Goulding, El Fidel Hotel, Albuquerque, New Mexico, where Ott was registered in the name of the true veteran, Harry T. Goulding. The check was issued, mailed, and delivered to Ott on April 7, 1931. On the same date, Ott presented the check to the First National Bank at Albuquerque, New Mexico (herein called bank) for payment. An officer of the bank called the attesting notary public by telephone, ascertained that Ott was the same person whom the notary public had identified as the true owner, Harry T. Goulding, in the loan application. After checking other identifying documents in Ott's possession, the check was cashed on the endorsement of Harry T. Goulding, and the proceeds delivered to Ott under the mistaken belief that Ott was

[1] Veterans' Administration—Regulations 4698. "To Whom Loan May Be Made.—Only the veteran named in the certificate can lawfully obtain a loan on his adjusted certificate * * *." Regulations 4699. "Identification.—Before a loan is made on an adjusted-service certificate, the person applying therefor will be identified as the person entitled to the certificate offered as security. Such identification, if made in the United States or possessions, will be accepted if the certificate is made by a * * * any person who is legally authorized to administer oaths in a state * * *."

Goulding. The bank endorsed the check "prior endorsements guaranteed," and negotiated the same to the Denver Branch of the Federal Reserve where it was paid in the regular course of business.

The fraud was discovered by the United States on April 13, 1937. Demand for reclamation was made on May 20, 1938, and thereafter refused. On October 10, 1938, the bank was notified that claim for reclamation "may be abandoned." On October 16, 1940, demand for reclamation was renewed and refused, and this suit was instituted to recover on the endorsement guaranty of the bank. The trial court gave judgment for the bank, applying the so-called impostor rule, and in the alternative held that the United States was guilty of laches which barred recovery and the United States has appealed.

By the appellant we are urged to hold that the question is judged by Federal law, and as so judged the transaction should be treated as a forgery, hence the endorsement guaranty of the bank was broken, and the government should recover on the guaranty of the endorsee, regardless of laches which cannot be imputed to it.

■ To what extent, if any, local law governs the rights and liabilities of the United States arising out of an obligation of the United States, or a transaction to which it is a party, has not been precisely defined. The question has received the attention, but not the decision, of the court of last resort. United States v. Bethlehem Steel Corporation, 315 U.S. 289, 62 S.Ct. 581, 86 L.Ed. 855; O'Dench, Duhme & Co., Inc., v. Federal Deposit Insurance Corporation, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956; United States v. Clearfield Trust Company, 3 Cir., 130 F.2d 93, decided July 29, 1942. We do not deem it essential to the solution of our problem to go further than to say that this suit involves the rights and liabilities of the United States, arising out of an obligation which it has assumed in its governmental capacity. The obligation assumed is created and authorized by an act of Congress which, to some extent at least, has provided the manner and means by which the obligation shall be discharged. Clearly therefore, its rights and liabilities thereunder cannot depend upon local law except insofar as it has consented to be bound. Board of Commissioners of Jackson County v. United States, 308 U.S. 343, 349, 60 S.Ct. 285, 84 L.Ed. 313; Deitrick v. Greaney, 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694; Royal Indemnity Company v. United States, 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361; O'Dench, Duhme & Co., Inc., v. Federal Deposit Insurance Corporation, supra; United States v. Clearfield Trust Company, supra.

■ It must be conceded however that when the United States becomes a party to commercial paper, it impliedly consents to be bound by the same rules governing private persons under the same circumstances. Cooke v. United States, 91 U.S. 389, 23 L.Ed. 237; United States v. National Exchange Bank of Baltimore, 270 U.S. 527, 46 S.Ct. 388, 70 L.Ed. 717; Lynch v. United States, 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434; United States v. Guaranty Trust Company, 293 U.S. 340, 350, 55 S.Ct. 221, 79 L.Ed. 415, 95 A.L.R. 651; United States v. First National Bank of Prague, 10 Cir., 124 F.2d 484. Whatever label we give the rule, whether Federal or state law, it derives its substance from the law merchant, and since New Mexico has not spoken on the question, we are at liberty to assume that its courts as well as the Federal law, will follow the uniform law governing commercial transactions. To that extent, we shall fashion the rule from the "materials at hand."

■ It is of course patent that if the endorsement of the payee be treated as a forgery, the bank as subsequent endorsee acquired no rights under it, and it is liable on its guaranty unless the United States is by its laches precluded from asserting the guaranty. See Section 23 of the Uniform Negotiable Instruments Act. If however, the so-called impostor rule has application under the facts, there is no forgery, the guaranty is not broken, and the United States cannot recover.

■ In a recent case, United States v. First National Bank of Prague, supra, 10 Cir., 124 F.2d 484, 486, this court considered the imposter rule under somewhat similar facts. Based upon a review of many adjudicated cases (cited therein), we announced the prevailing rule as follows: "With few exceptions, it is held that the drawer of a check, bill of exchange, or other negotiable instrument, cannot recover from an intermediary bank on its endorsement, or from the payee bank upon its payment, where the check, bill, or other instrument is drawn and delivered to an imposter under the mistaken belief on

the part of the drawer that he is the person whose name he has assumed and to whose order the check, bill, or other instrument is made payable, and the intermediary bank acquires it from the impostor upon his endorsement thereon of the name of the 'payee, or the payee bank pays it upon such endorsement, as the case may be. Although not in full accord in respect of the reasons for their conclusion, most courts hold that while the drawer acts in the mistaken belief that the person with whom he deals either in person or by correspondence is the person whose name he has assumed and pretends to be, still it is the intent of the drawer to make the check, bill, or other instrument payable to the identical person with whom he deals and therefore to be paid on his endorsement; and that accordingly payment to him or his endorsee merely effectuates the intent of the drawer."

Some cases do not accept the thesis upon which the so-called impostor rule is based, United States v. Onondaga County Savings Bank, D.C., 39 F. 259; Onondaga County Savings Bank v. United States, 2 Cir., 64 F. 703; United States v. National Exchange Bank, 214 U.S. 302, 29 S.Ct. 665, 53 L.Ed. 1006, 16 Ann.Cas. 1184; United States v. Canal Bank & Trust Co., D.C., 29 F.Supp. 605. Other courts accept it but refuse to apply it under similar facts. United States v. National City Bank of New York, D.C., 28 F.Supp. 144; Cohen v. Lincoln Savings Bank, 275 N.Y. 399, 10 N.E.2d 457, 112 A.L.R. 1424. See also annotations, 22 A.L.R. 1228; 52 A.L.R. 1326. Cases which do not accept or refuse to apply the rule rely primarily on what was said in United States v. National Exchange Bank, supra, which did not mention or recognize the impostor rule under somewhat analogous facts. The decision there rested upon the question of whether the United States should be held to the rule that a drawee or the maker of a check should be held to know the genuineness of its own paper. We think the case must be considered in the light of what was said in United States v. Chase National Bank, 252 U.S. 485, 40 S.Ct. 361, 64 L.Ed. 675, 10 A.L.R. 1401, and United States v. National Exchange Bank of Baltimore, supra. See, also, Security-First National Bank v. United States, 9 Cir., 103 F.2d 188.

■ In United States v. First National Bank of Prague, supra, we left no room for doubt that in our view the impostor rule had application to transactions of the government in a proper case. The application of the announced rule was considered in connection with a check drawn by the United States in consummation of a loan on an adjusted service certificate, identical with the one here involved, and paid by the First National Bank of Prague, endorsed by it to the Tradesmens National Bank of Oklahoma City, and by it endorsed and negotiated to the federal reserve. We refused, however to apply the impostor rule as between the United States and the Prague bank which had first made contact with the impostor, and by such contact had unwittingly and unconsciously initiated the fraud which was subsequently perpetrated on the veterans' facility. The Prague bank accepted the impostor who held in his possession an adjusted service certificate which he had stolen from the true veteran. The officer of the bank, acting as a notary public, authenticated the application for the loan and mailed the same to the veterans' facility, giving the bank as the address of the impostor. The bank had negotiated a loan on the certificate and the check was mailed to the impostor in care of the Prague bank where it was paid on his forged endorsement impostor, and by this bank endorsed and negotiated to the intermediary correspondent bank in Oklahoma City, which also endorsed same for payment to the federal reserve. We held in these circumstances that since the issuance and the mailing of the check to the impostor by the veterans' facility was not the first act which made possible the loss, but on the contrary the bank first imposed confidence in the impostor and cooperated with him, thereby unwittingly contributing to the deception of the veterans' administration in respect to the vital matter of identity, and that since such cooperation constituted the initial act which resulted in the fraudulent transaction, the Prague bank was not entitled to the application of the impostor rule. As between the United States and this bank the transaction fell within the well established rule that as between two innocent persons, both of whom are victims of fraud, the burden must fall upon the one whose negligence first facilitated it and made possible the loss. We applied the rule as between the United States and the intermediary correspondent bank which had endorsed the check and negotiated the same to the federal reserve branch in the regular course of business.

The facts here bring this case squarely within the impostor rule. It is said that the application of the impostor rule is based upon the intention of the drawer to make the check payable to the identical person with whom he deals, and that since under the statute, the disbursing agent for the veterans' facility had no authority to issue the check to any person other than the true veteran, it cannot be held to have intended to do otherwise. But if the intentions of the disbursing agent are to govern, shall they be discerned by what he thought he was doing because he could not legally do otherwise, or by what he physically and actually did in effecting his purposes and intentions.

Here the impostor was in possession of an adjusted service certificate. He undoubtedly obtained the prescribed forms for a statutory loan from the veterans' facility and personally presented the same to the facility, duly authenticated in prescribed form. He apparently came face to face with the disbursing agent who was convinced that the person who stood before him was Harry T. Goulding, the true and lawful owner of the certificate. The check was drawn and delivered by mail to the same person who made application for the loan and whom the veterans' facility intended should receive the same. The veterans' facility knew and intended that this same physical person to whom they had delivered the check would present it for payment upon the endorsement of Harry T. Goulding. It must be presumed that a check fraudulently obtained will be fraudulently used. When the check was presented to the bank by the person to whom it had been delivered, the bank ascertained that the same person had appeared before a notary public who had attested to his identity as Harry T. Goulding, and that the veterans' administration had relied upon this same means of identification in issuing the check. The bank had before it ample proof of the admission of the veterans' facility that the present holder of the check was in fact the identical person to whom it had been delivered as the true veteran, Harry T. Goulding. Doubtless, if the bank had called the disbursing agent who had issued the check, describing the person who was then presenting it for payment, the agent would have stated that he had delivered the check to the identical party as the true payee. In these circumstances, it cannot be doubted that the bank merely effectuated the purposes and intentions of the drawer.

Government checks are fluently employed in the commerce of the country, and are accepted upon reasonable identification in the regular course of business as other obligations of such character. If banks are to be made to use greater diligence than is shown to have been exercised here, the result is to destroy the free negotiability of the obligations of the United States government. We hold that the so-called impostor rule has application and the government cannot recover.

In view of what we have said, it is unnecessary to consider the question of laches further than to refer to what was said in that respect in United States v. First National Bank of Prague, supra, wherein we held that the government was not subject to the rule of laches under the same facts.

The judgment is affirmed.