**ATLANTIC NATIONAL BANK OF JACKSONVILLE, FLORIDA; Little River Bank and Trust Company and First National Bank of Palm Beach, Appellants,**

v.

**UNITED STATES of America, Appellee.**

No. 16556.

United States Court of Appeals Fifth Circuit.

Dec. 10, 1957.

H. Reid DeJarnette, Joseph F. Jennings, Dixon, DeJarnette, Bradford & Williams, Miami, Fla., for appellants.

E. David Rosen, Asst. U. S. Atty., Miami, Fla., Paul A. Sweeney, Chief,

**116**

Peter H. Schiff, Atty., App. Sec., Dept. of Justice, Washington, D. C., George Cochran Doub, Asst. Atty. Gen., James L. Guilmartin, U. S. Atty., Miami, Fla., for appellee.

Before RIVES, JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

■ In the process of fashioning a federal jurisprudence concerning the Government's own commercial paper, Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838, this Court in Continental-American Bank & Trust Co. v. United States, 5 Cir., 161 F.2d 935; United States v. Continental-American Bank & Trust Co., 5 Cir., 175 F.2d 271, certiorari denied 338 U.S. 870, 70 S.Ct. 146, 94 L.Ed. 534, along with many others,[1] has adopted the "impostor rule." Under it, when the drawer or issuer of a check intends that it shall go to the person falsely pretending to be another who is in fact nonexistent, the endorsement in the fictitious payee's name by the pretender is not a forgery and an endorser bank is not liable to the drawee-drawer on the traditional stamped endorsement "all prior endorsements guaranteed."

■ The District Court, without elaboration of the process of reasoning, held that the stipulated facts presented a case not for the impostor rule, but one of *forged* endorsements of the payee subjecting the endorser to liability under the well recognized principle applied in

United States v. National Exchange Bank of Providence, 214 U.S. 302, 29 S.Ct. 665, 53 L.Ed. 1006; National Metropolitan Bank v. United States, 323 U.S. 454, 65 S.Ct. 354, 89 L.Ed. 383, affirming 79 U.S.App.D.C. 54, 142 F.2d 474. We disagree.

The stipulated facts, neither complex nor conflicting, can readily be summarized. They demonstrate that, whatever the legal consequences, the Government's loss in fact came not from action or nonaction of the banks handling Government paper in the regular course of business, but flowed entirely from the infidelity of the Government's own agent who successfully confected a scheme to cheat his master. During the period from 1949 to January 22, 1951, Wilson Earle Howard, a United States Deputy Tax Collector in the District of Florida, prepared and filed with the Collector of Internal Revenue for that District income tax returns using fictitious names for the taxpayers and their employers both on the returns and the attached statements of taxes withheld on the "W-2" forms.[2] All of these false returns requested refunds since the "W-2" forms showed that the amount of tax withheld exceeded the amount due for taxes. The United States Treasury issued each of the checks involved here without ascertaining whether a return had been filed by the specified employer and consequently without checking to determine whether the named fictitious or nonexistent payee was, in fact, an employee and entitled to the claimed refund. This

1. United States v. First National Bank of Albuquerque, 10 Cir., 131 F.2d 985, certiorari denied 318 U.S. 774, 63 S.Ct. 830, 87 L.Ed. 1144; Security-First National Bank of Los Angeles v. United States, 9 Cir., 103 F.2d 188; United States v. Liberty Insurance Bank, D.C.Ky., 26 F.2d 493; Fidelity & Deposit Company of Maryland v. Union Trust Company, 2 Cir., 129 F.2d 1006; 22 A.L.R. 1228, 52 A.L.R. 1326, 112 A.L.R. 1435; United States v. Union Trust Co., D.C.Md., 139 F.Supp. 819.

2. The stipulation spelled out that the Internal Revenue laws provide that em-

ployees shall receive "W-2" forms from each employer at the end of each calendar year indicating the amount of income paid by the employer to the employee and the amounts withheld for income tax and social security. The "W-2" form is then filed by the employee, together with his income tax return, and if the amount of income tax withheld exceeds the amount of tax the employee must pay as reflected by the return, the employee indicates on the return whether the excess is to be applied to the ensuing year's income tax or is to be refunded to the employee.

action by the Collector of Internal Revenue and the Disbursing Officer, in each instance, was done without any further verification by either of them as to the right of the payee to be paid. Each relied solely upon the names appearing upon the fictitious income tax returns in paying the refunds, but with the belief and intention that the person named as payee in the check would receive the benefits therefrom.

Howard, in each case, obtained each of these checks and signed the name of the fictitious or nonexistent payee as an endorsement and, except as to three isolated checks, added a second endorsement in another fictitious name and then deposited the checks in accounts opened in various community banks. The checks were subsequently forwarded to the appellant banks for presentation. In the regular course of business, after affixing the obligatory [3] guarantee of prior endorsements, these banks presented the checks to the Jacksonville Branch of the Federal Reserve Bank of Atlanta, the Fiscal Agent for the Government, who paid the face amount of each check to the appellant banks.

On these undisputed, agreed facts, we think it plain that this is the classic case of an impostor. That the dealings between Howard, pretending to be each of these nonexistent employee-taxpayers, and the Government Disbursing Officer were not carried out face to face in the relative simplicity of our former pioneer economy is of no significance. For the "impostor rule" has developed and is frequently applied [4] in today's complex business community where so much is transacted by the impersonal submission, transmission and exchange of documents through the mails or similar means.

As in the case of countless other routine commercial transactions in which claims for payment or refund are processed in the business world, there is little to breathe into the transaction an articulate consensual "intent" which would characterize more weighty matters or those found in a more primitive society. But the fact remains, as the stipulation tediously spells out, that the Government Revenue Service accepted the tax returns as genuine. The Government considered that the fictitious taxpayers existed. After such administrative checking as the Government thought sufficient, it concluded that each such person was entitled to a refund. To effectuate the intended refund, the Government made out a check to that person and required that before the check was paid, that *that* person should endorse it.

That person was, of course, not the fictitious nonexistent name, but Howard who had alone submitted the papers constituting the claim. As in case of Bertha Smith, pretending to be the rightful claimant Beulah Mitchell Gibbs, the checks here " \* \* \* were intended to go, as they did, to this very flesh and blood person [Howard] as payee, though that intention was procured by fraudulent misrepresentation as to [his] name and status. The checks were delivered to [him] and intended for [him], and though they were voidable for fraud, [he] was the payee." United States v. Continental American Bank & Trust Co., 5 Cir., 175 F.2d 271, at page 272.

---

**3.** Both Clearfield, 318 U.S. at page 365, note 1 and 2, 63 S.Ct. at page 574, and National Metropolitan Bank, 323 U.S. at page 458, 65 S.Ct. 354, point out that specific regulations of the Federal Reserve System not only compel the endorsement "all prior endorsements guaranteed" but go so far as to deem the endorsement to have been made whether it was so in fact or not. The regulations are now codified at 31 C.F.R. 202.25(c) and 360.

**4.** Britton on Bills and Notes (1943), pages 715–725: "By the weight of authority the impostor who conducts fraudulent negotiations by impersonation by mail or telegraph similarly gets title to the instrument thus fraudulently obtained." And see Brannan (Beutel's) Negotiable Instruments Law, 7th Edition, pages 470–480.

While the dealings were routine and impersonal, they were nevertheless dealings of a kind which the Revenue Service must transact thousands of times each day. The dealings had to be between the Revenue Service and some person, otherwise the papers would never have been submitted in the first instance. And, of course, the only person was Howard. True, he was using a variety of fictitious names, but it was he alone who initiated and carried out the dealings, and it was with him, under other names, that the Government was necessarily carrying on its dealings. The result follows that " * * * where the drawer of a check has dealings with an impostor who assumes a false name, and the check is intended for the person with whom the drawer is dealing, payment of the check by the bank to such impostor or on his endorsement will be authorized and binding upon the * * *" drawer, 7 Amer.Jur., Banks, § 599.

As we have twice so painstakingly pointed out, the cases pressed by the Government are not at variance with our action. In United States v. National Exchange Bank, supra, the endorser "was not an impostor, but a common forger"; in Clearfield Trust Company v. United States, supra, the payee's endorsement, " * * * was no case of imposture, but a simple case of forgery" and in National Metropolitan Bank v. United States, supra, the endorser " * * * was not an impostor, but a forger." United States v. Continental-American Bank & Trust Co., 175 F.2d 271, at page 272.

The ready fluid circulation of negotiable commercial paper requires the assurance to the drawee that the payee's endorsement has not been forged because the drawer's engagement is that the drawee will pay only when the person to whose order the instrument is drawn shall have endorsed it. Where a Government agent, in violation of simple honesty or breach of trust, acquires possession of a check payable to an existing payee and forges the name of that payee, the loss will, of course, fall on the presenting bank, National Metropolitan Bank v. United States, supra. But this comes from the nature of the engagement in the negotiable paper. But it subjects banks to unreasonable burdens against which they could not reasonably protect themselves short of a complete embargo on Government checks to hold them not only to a guarantee that an existing person named and intended as payee has signed the endorsement, but that the very person named, and in that name and no other, had a just claim against the Government for which the check was issued. If through fraud practiced on the Government, either by outsiders or its own unfaithful servants, a check is delivered to one upon the mistaken belief that it is due such person, the endorsement of that impostor, whether in that name or in another, is not a forgery and the Government's loss is not that of a drawee who has been led to pay on the assumption that only the one authorized by the payee has made the endorsement. Rather, the Government's loss is that of one defrauded by a dishonest employee who set the scheme in motion. The necessity for unfettered circulation [5] of the Government's negotiable paper not only does not require—it actually forbids—that such loss should be visited on the collecting banks.

Reversed and rendered.

5. Actually, the alternative to our decision suggested by us in United States v. Continental-American Bank & Trust Co., 175 F.2d 271, at page 272:
"To hold otherwise would tend to destroy negotiability and force the payee to present the check at a Federal Reserve Bank only, and there prove not only that the check was issued to him but also that he was the very person the government owed."
turns out to be unavailing. For the regulations (see note 3, supra) compelling the endorsement also provide:
"(b) Federal Reserve Banks will not be expected to cash Government checks presented direct to the bank by the general public." 31 CFR 202.25

RIVES, Circuit Judge (dissenting).

I agree with the learned district judge.[1] In issuing and paying its checks, the United States is exercising a constitutional function or power,[2] which cannot be expanded by the so-called "impostor rule" adopted by some, but not all, of the states. Many of the underlying reasons for that rule, such as estoppel against or negligence of the drawer, cannot be applied against the Government.[3] In the absence of approval of the "impostor rule" by the Supreme Court, I adhere to the view that it should not serve to weaken or confuse the unconditional warranty of the title of him who presents the check for payment.[4]

Assuming arguendo, however, that the "impostor rule" may be applied against the Government, the stipulated facts in this case do not bring the checks within that exception. Howard never did pose as or pretend that he himself was any one of the fictitious payees of the 109 checks. His fraudulent pretense was that such payees actually existed and were entitled to the refunds. In one sense or another every forger is an impostor, but, as Mr. Justice Cardozo indicated in Strang v. Westchester County National Bank, 235 N.Y. 68, 138 N.E. 739, 741, " * * * the line is hard to draw between the impostor who appropriates what is intended for another, and the impostor who deceives by misrepresenting his responsibility or character." See also 8 Am.Jur., Bills and Notes, § 602; 10 C.J.S. Bills and Notes § 494(b). It seems clear to me that Howard simply appropriated checks intended for 109 other, albeit fictitious,

persons, and that he did not become a human chameleon by impersonating each of those many people. It seems preposterous to say that Howard was the real payee, the person for whom each of the 109 checks was really intended.

I agree with some of the statements in the majority opinion, e. g.:

"Each [the Collector and the Disbursing Officer] relied solely upon the names appearing upon the fictitious income tax returns in paying the refunds, but with the belief and intention that the person named as payee in the check would receive the benefits therefrom."

\*       \*       \*       \*       \*

"The Government considered that the fictitious taxpayers existed. After such administrative checking as the Government thought sufficient, it concluded that each such person was entitled to a refund. To effectuate the intended refund, the Government made out a check to that person and required that before the check was paid, that *that* person should endorse it."

I disagree, however, with the easy assumption which follows: "That person was, of course, not the fictitious nonexistent name, but Howard who had alone submitted the papers constituting the claim." Instead, I would say, "While that person was nonexistent, it certainly was not Howard, who had misrepresented the existence of such person, but not that he himself was that person."

Further as to 106 of the checks, the banks derived title through still another

1. "The defendant banks are liable to the plaintiff upon the guaranty of all prior indorsements. United States v. National Exchange Bank, 214 U.S. 302, [29 S.Ct. 665, 53 L.Ed. 1006]; National Metropolitan Bank v. United States, 323 U.S. 454, [65 S.Ct. 354, 89 L.Ed. 383.]

"The statement of facts herein is not applicable to the exceptions noted in the cases of Continental-American Bank and Trust Co v. United States, [5 Cir.,] 161 F.2d 935 and United States v. Continental-American Bank and Trust Co., [5 Cir.,] 175 F.2d 271."

2. Clearfield Trust Co. v. United States, 1943, 318 U.S. 363, 366, 63 S.Ct. 573, 87 L.Ed. 838.

3. United States v. National Exchange Bank, 1909, 214 U.S. 302, 29 S.Ct. 665; National Metropolitan Bank v. United States, 1945, 323 U.S. 454, 65 S.Ct. 354.

4. Clearfield Trust Co. v. United States, 1943, 318 U.S. 363, 368, 63 S.Ct. 573.

fictitious endorsement, the creature of Howard's own evil imagination, whose existence or identity was never in any way vouched for by the Government. Moreover, as to those checks, the banks could not have been led to believe that the first endorsement was made by the intended payee.

Certainty and definiteness are perhaps the most desirable characteristics of the law of negotiable instruments. The "impostor rule" introduces confusion, requiring the ascertainment of nonexistent intent and almost metaphysical speculation degenerating into mere logomachy. Better, I submit, to adhere to the simple and definite rule that each endorser guarantees the genuineness of all prior endorsements. Being of the firm opinion that neither Howard, his fictitious endorsees, nor the banks to which the Government made payment ever acquired title to the checks, I respectfully dissent.