**UNITED STATES v. NATIONAL CITY BANK OF NEW YORK.**

District Court, S. D. New York.
Jan. 30, 1939.

Lamar Hardy, U. S. Atty., of New York City (Thomas McCall, Asst. U. S. Atty., of New York City, of counsel), for the United States.

Shearmen & Sterling, of New York City (Herman E. Compter, of New York City, of counsel), for defendant.

LEIBELL, District Judge.

This is an action by the United States, as maker and drawee of a check, to recover the amount thereof from The National City Bank of New York, which endorsed the check and collected the proceeds thereof. The government contends that the endorsement of the payee, John Brown, was a forgery and that defendant is liable on its guarantee of prior endorsements. Defendant denies the forgery and pleads as a special defense the government's laches in giving notice of the forgery, which deprived defendant of an opportunity for recoupment from prior endorsers. The action was commenced on November 30, 1937. A jury trial was waived and the case was submitted on an agreed statement of facts as follows:

One, John Brown, colored (hereinafter referred to as veteran Brown), a resident of Wake Forest, North Carolina, became entitled to certain benefits conferred by Congress under the World War Adjustment Compensation Act, 38 U.S.C.A. § 591 et seq., by reason of his army service. In 1925, pursuant to said Act, he applied for an Adjusted Service Certificate. On or about June 1, 1925, the Government by its Veterans Administration addressed and sent by registered mail to "John Brown, Wake Forest, N. C." an adjusted service certificate in the face amount of $996, that being the compensation to which the said John Brown was entitled. The Post Office Department delivered the certificate to another individual, also colored, not a veteran, but residing near Wake Forest, North Carolina, bearing the same name as the veteran. This individual is hereinafter referred to as non-veteran Brown. Non-veteran Brown was not entitled to any of the benefits granted by the Act. On or about March 11, 1930, non-veteran Brown applied for a loan on the certificate using the form of a "Veteran's Note" provided for that purpose by the Veterans Administration, the loan applicant being identified and the application authenticated by a local American Legion Post official. On or about the same day non-veteran Brown presented said application for a Veterans Administration loan, together with the adjusted service certificate, to the First National Bank of Roxboro, North Carolina, and upon the strength of said application and pending the granting of the loan by the Veterans Bureau, the bank discounted his sixty-day note for $140, endorsed by the Secretary of the Local Post of the American Legion at the time. The bank and non-veteran Brown agreed that the proceeds of the Veterans Bureau's loan on his adjusted service certificate should be sent to non-veteran Brown in care of the bank and used by the bank to retire the bank's loan to him. Non-veteran Brown's application for a Veterans Administration loan together with the adjusted compensation certificate were sent by mail to the Veterans Administration.

The check in question was drawn at "Charlotte N. C. Mar. 21, 1930" by "John W. Reynar, Special Disbursing Agent, by C. M. Foil" on the Treasurer of the United States in the sum of $152.00, payable to the order of "John Brown, A-3625211, % First National Bank, Roxboro, N. C." It bore in the left hand margin an official seal over which appear the printed words "United States Veterans Bureau". Below the seal is printed "Object for which drawn: Adjusted service certificate loan". The check was received at the First National Bank, Roxboro, N. C. on March 22, 1930. The bank's cashier endorsed the name John Brown on the reverse side of the check, used $140 of the proceeds thereof to retire non-veteran Brown's note at the bank, and delivered the balance of the proceeds in cash to non-veteran Brown. It

appears that the endorsement of the name "John Brown" was made by the bank's cashier with the authority, consent and approval of non-veteran Brown and the validity of the endorsement as the endorsement of non-veteran Brown is not questioned.

Said check was thereupon endorsed by the Roxboro bank with the usual stamped endorsement, making the check payable to the order of any bank, banker or trust company and guaranteeing all prior endorsements and was then transmitted on or about March 25, 1930, to the First National Bank of Durham, North Carolina, for collection. On or about March 25th, 1930, the Durham bank likewise endorsed the check with a similar stamped endorsement and forwarded the check to the defendant, National City Bank, in New York City for collection. Thereupon the defendant bank put its stamped endorsement on the check and presented the check for payment and received payment thereof through the New York Clearing House from the Federal Reserve Bank of New York on March 28th, 1930. Said check when presented and paid bore the following stamped endorsement of the defendant bank: "Received payment through New York Clearing House—prior endorsements guaranteed—The National City Bank of New York—N. C. Lenfestey, Cashier."

Thereafter the Federal Reserve Bank of New York either collected the amount of said check from the Treasurer of the United States or received reimbursement from the Treasurer of the United States of the amount paid on said check. Upon payment or prior thereto, the proceeds of said check were credited or paid by the defendant bank to the First National Bank of Durham, North Carolina, which in turn credited or paid said proceeds to the First National Bank of Roxboro, North Carolina.

All the banks above mentioned, including the defendant bank, received and endorsed the check in question and paid over its proceeds in reliance on prior endorsements and guarantees thereof, in good faith and without notice or knowledge of any infirmity in the instrument, any irregularity in the endorsement of the payee or any defect in the title of any prior party.

It is stipulated by the parties that non-veteran Brown received the proceeds of said check and caused said check to be endorsed as aforesaid without fraudulent intent and in the belief that he was a war veteran and entitled to the benefits of the Compensation Act and in the belief that he was the payee named on the check.

In April, 1931, veteran Brown again applied for an adjusted service certificate under the Act and in response to his application he was notified that certificate 2713137 in the amount of $996, effective June 1, 1925, had been mailed to him. The certificate number was the same as that on the certificate which non-veteran Brown had received in 1925. On November 3, 1931, veteran Brown signed, verified and delivered to plaintiff's Veterans Administration an affidavit stating that he had not received his certificate and had not applied for any loans thereon. The government investigated the matter and on April 14, 1932, its operative reported to the government the circumstances under which the certificate and check in question had come into the hands of non-veteran Brown. The parties have stipulated that the operative's report stated "that the indorsement on the check in the name of 'John Brown' was a forgery." That part of the operative's report relates to the check representing a further and third loan that non-veteran Brown obtained from the Veterans Bureau in March 1931. I do not think that is material since the report recites the results of the operative's investigation as to all three checks. On November 18, 1935, the government made demand upon the defendant bank for reimbursement of the face amount of the check, to wit, $152, and notified the bank of the irregularity in connection with the endorsement, collection and payment of the check.

Between March 11, 1930, the date of the loan by the First National Bank of Roxboro, North Carolina, to non-veteran Brown and November 18, 1935, the date of the government's demand for reimbursement upon the defendant bank, other important events had occurred. The First National Bank of Roxboro, North Carolina, and the First National Bank of Durham, North Carolina, were closed for insolvency by the Comptroller of the Currency, the former on October 19, 1931, and the latter on January 16, 1932. Prior to November 18, 1935, the date of the government's demand, the assets of these banks had been completely liquidated and distributed to the banks' creditors. On November 18, 1935, no funds were available in either bank from which these banks could make good on their endorsements of the check in suit.

On November 19, 1935, the defendant bank made demand for reimbursement upon the First National Bank of Durham, North Carolina, but the receiver of said bank refused to honor said demand for the reason that said bank and the First National Bank of Roxboro, North Carolina, had no funds available to pay the claim. The Statute of Limitations of the State of North Carolina, within which to institute an action upon a guarantee of prior indorsement, is three years after the payment of the check. Code N.C.1935, § 441.

The parties have also stipulated that at the time of the payment and collection of the check and until September 13, 1932, the First National Bank of Durham, North Carolina, maintained an account with the defendant bank in which the credit balance at all times exceeded the sum of $152. This account of the First National Bank of Durham, North Carolina, with the defendant bank was closed on September 13, 1932, at which time defendant sent its cashier's check for $2,360.28 to the First National Bank of Durham, North Carolina.

The government contends that the defendant bank is liable on the check, because of its guarantee of the prior endorsements, the first of which (non-veteran Brown's) was a forgery. The defendant bank seeks to avoid liability by asserting (1) that the payee's endorsement on the check was not a forgery and (2) that even if it were, the plaintiff cannot succeed because (a) of its own negligence which set in motion the machinery resulting in the loss and (b) because the government has lost its remedy by its laches and delay in failing promptly to notify the defendant that said check had been received and cashed by a person other than the person entitled thereto, with the direct result that defendant has lost all chance of reimbursement from prior endorsers on said check.

The first question to be answered therefore is this: Was the endorsement of the name "John Brown", upon the check in question, a forgery? If it was not, obviously the plaintiff cannot succeed for the forgery is the sole basis of its claim. If the endorsement was a forgery then negligence and laches are proper subjects of inquiry.

In support of an affirmative answer to the first question the government maintains (1) that neither the intended payee nor his authorized agent endorsed the check in question and since the government intended veteran John Brown and no other, to be the payee of the check, only he could legally endorse and negotiate it, and (2) if another, not the intended payee, obtained possession of said check, he could not without the consent and approval of the true payee negotiate the check, so as to confer legal title thereto upon another. The defendant, however, contends that there was no forgery here because the plaintiff drew its check payable to the order of "John Brown" and delivered it to a person by the name of John Brown, who caused it to be endorsed and who received the proceeds. Defendant takes the position that it should not be bound by the plaintiff's undisclosed intent and that under the peculiar circumstances of the case and on its facts there could be no forgery.

■ The authorities in this state do not support the defendant's view on the issue of forgery. A similar situation was presented to the Court of Appeals of this State as early as 1858 and the court then held that it was forgery for a person not the payee of a bill of exchange but bearing the same name to endorse and transfer it. Graves v. American Exchange Bank, 17 N.Y. 205. This case was cited with approval by the same court in 1937 in Cohen v. Lincoln Savings Bank, 275 N.Y. 399, at page 405, 10 N.E.2d 457, at page 460, 112 A.L.R. 424, wherein the Court of Appeals said: "The rule that the payee of the check is the particular person who was intended by the drawer to be the payee can hardly be questioned. The name by which he is designated is merely the tag by which the intended person may be identified. A person, though bearing that name, if not the person intended, has no title to the check and cannot indorse or transfer title to it. Graves v. American Exchange Bank, 17 N. Y. 205."

■ Nor can the stipulated fact that non-veteran Brown received the proceeds of said check, and caused said check to be endorsed as aforesaid without fraudulent intent, and in the belief that he was a veteran and entitled to the benefits of the World War Adjusted Compensation Act, and in the belief that he was the payee named in said check, change the result herein. The Court of Appeals in Graves v. American Exchange Bank, supra, said at page 208: "In this case if the indorsement of the payee's name was not technically a forgery it was at all events spurious and false, and therefore equally inoperative to change

the title. The point appears to have been expressly determined in Mead v. Young (4 Term R., 28)."

In the Graves case a person of the same name as the payee "wrongfully took" the draft "from the post office". In deciding whether or not a forgery has been committed the intention of the drawer and not the state of mind of the payee is the controlling and determining factor. In this connection the Court of Appeals in Halsey v. Bank of New York & Trust Co., 270 N. Y. 134, at pages 138 and 139, 200 N.E. 671, at page 673, wrote: "In determining whether there was a forgery, the true test is whether or not the indorsement of the name of the payee was made by the person who was intended by the drawer to be the payee. If such person indorsed, there is no forgery. McKeehan, Negotiable Instruments Law, 41 Am.Law Reg.(N.S.) 437, 499, 561; Brannan, Negotiable Instruments Law (2d Ed.) [pp.] 220, 248."

It seems to me that the drawer's intended payee of the check of $152 was the veteran John Brown who was the rightful owner of the adjusted service certificate that was pledged as collateral security for the loan of $152.00 made by the Veterans Bureau. Cohen v. Lincoln Savings Bank, 275 N.Y. 399, 407, 10 N.E.2d 457, 112 A.L. R. 424. The named payee of the check was already known to the drawer as one who had served in its armed forces during the world war and as the person to whom the adjusted compensation certificate, pledged as collateral for the loan, had been forwarded pursuant to the Act. His veteran's number and the purpose of the check appeared on the face of the check. The drawer before making the loan, the proceeds of which are represented by the $152 check, took the precaution to have the applicant fill out and send in a departmental form of note on which his identity was vouched for by a representative of a veteran's organization, the American Legion; and the drawer required as security, a pledge of the original adjusted compensation certificate that it had itself issued.

█ The veteran's note forwarded to the Director of the United States Veterans Bureau on which the loan was made, gives the location of the Regional Office or Hospital making the loan as "United States. Veterans Bureau, Charlotte, N. C." at which place the note was payable "one year after date of check issued by the Veterans Bureau in consideration of this note," the loan applicant being identified and the application authenticated by a local American Legion Post official. The certificate of identification at the end of the note contained the following instruction: "Certificate should be executed by the Postmaster of the community in which the veteran lives, or by an officer, over his official title, of a post, chapter, or other comparable unit of an organization recognized under Section 500 of the World War Veterans Act or an officer, over his official title, of the state or national body of such organization, or a notary public."

The American Legion was an organization recognized under Section 500 of the World War Veterans' Act, 38 U.S.C.A. § 551. The drawer had no reason to suspect fraud or to require further identification. Onondaga County Savings Bank v. United States, 2 Cir., 64 F. 703; City of New York v. Bronx County Trust Co., 261 N.Y. 64, 184 N.E. 495.

Adjusted service certificates were issued to the World War Veterans pursuant to the provisions of the "World War Adjusted Compensation Act"—approved May 19, 1924. 43 Stat. 121 et seq., 38 U.S.C.A. § 591 et seq. Section 501 provided for the issuance of the certificates by the Director of the United States Veterans Bureau upon certification by the Secretary of War or the Secretary of Navy, pursuant to Section 303, of an application filed by a veteran under Section 302. 38 U.S.C.A. § 612. The provisions of Section 303, 38 U.S.C.A. § 613, were:

"Sec. 303 [§ 613]. (a) As soon as practicable after the receipt of a valid application the Secretary of War or the Secretary of the Navy, as the case may be, shall transmit to the Director of the United States Veterans' Bureau (hereinafter in this Act [chapter] referred to as the 'Director') the application and a certificate setting forth—

"(1) That the applicant is a veteran;

"(2) His name and address;

"(3) The date and place of his birth; and

"(4) The amount of his adjusted service credit together with the facts of record in his department upon which such above conclusions are based.

"(b) Upon receipt of such certificate the director shall proceed to extend to the veteran the benefits provided for in Title [Part] IV or V [of this chapter]."

The certificate #2713137 issued in the name of veteran Brown bore on its face the statement: "Neither this Certificate nor any right conferred herein, or incidental thereto, shall be negotiable, or assignable, or serve as security for any loan except as provided in Section 502 of Title V of The World War Adjusted Compensation Act here set forth:"

The loan privileges provided in Section 502 are introduced by the opening statement contained in subdivision (a): "Sec. 502 [§ 642]. (a) A loan may be made to a veteran upon his adjusted-service certificate only in accordance with the provisions of this section." 38 U.S.C.A. § 642 (a).

Subdivision (b) sets forth the conditions under which banks were authorized to make loans to a veteran "upon his promissory note secured by his adjusted-service certificate".

By an amendment approved March 3, 1927, subdivisions, (i), (j) and (k) were added to section 502, 38 U.S.C.A. § 642 (i, j, k), and the Director of the United States Veterans Bureau was authorized "through such officers and at such regional offices, suboffices and hospitals of the United States Veterans' Bureau [Administration] as he may designate, and out of the United States Government life insurance fund * * * to make loans to veterans upon their adjusted-service certificates in the same amounts and upon the same terms and conditions as are applicable in the case of loans made under this section by a bank".

A certificate, under the Act, could be legally issued only to a veteran and in the manner provided in the Act. Loans on the certificates could be made by the Director of the Veterans Bureau only to the veteran named in the certificate on the pledge of the certificate with the Director. The note itself on which the $152 loan was made contained the following statement: "As collateral security for the payment of the obligation herein assumed by me I have delivered to and do hereby pledge with the holder of this note my adjusted service certificate No. 2713137, dated June 1, 1925, further identified by No. A. 3625211. If there is any part of the obligation herein assumed, whether principal or interest, unpaid at the date fixed for the maturity of said certificate, or at the date of the death of the maker of this note should he die before the date fixed for the maturity of said certificate, the amount of such indebtedness shall be deducted from the amount otherwise due the beneficiary under said certificate and the amount so deducted shall be paid to the holder of this note."

■ The Director's intent that veteran Brown be the payee of the check is certain. The facts here, on the issue of forgery, resemble in some respects those involved in Rossi v. National Bank, 71 Mo.App. 150 and Mercantile Nat. Bank v. Silverman, 148 App.Div. 1, 132 N.Y.S. 1017, affirmed 210 N.Y. 567, 104 N.E. 1134, and Keel v. Wynne, 210 N.C. 426, 187 S.E. 571. I conclude, therefore, that there was a forgery in this case because veteran Brown, the person actually intended as the payee of the check, did not endorse the check.

The Uniform Negotiable Instruments Act was adopted (1) in the year 1899 in the State of North Carolina, where the check was drawn and in which non-veteran Brown endorsed the check as did the Roxboro bank and the Bank of Durham; (2) in 1897 in the State of New York, where the defendant, National City Bank, endorsed the check and received payment thereof from the Federal Reserve Bank, through the New York Clearing House; and (3) in 1899 in the District of Columbia where the check was payable by the Treasurer of the United States. Section 23 of the Uniform Negotiable Instruments Act reads as follows: "§ 23. *Forged Signature; Effect of.*—When a signature is forged or made without the authority of the person whose signature it purports to be, it is wholly inoperative, and no right to retain the instrument, or to give a discharge therefor, or to enforce payment thereof against any party thereto, can be acquired through or under such signature, unless the party against whom it is sought to enforce such right, is precluded from setting up the forgery or want of authority." District of Columbia, Code of 1929, Title 22, Section 24; New York Negotiable Instruments Law, Section 42; North Carolina Code, 1935, Section 3003.

We have no question of the conflict of laws in this case, such as was involved in the decision of United States v. Guaranty Trust Co., 293 U.S. 340, 55 S.Ct. 221, 79 L.Ed. 415, 95 A.L.R. 651.

■ In my opinion there was no negligence on the part of the Veterans Bureau in the procedure it followed in making the loan represented by the $152 check, or

150

in forwarding the check. Nor was there any negligence on the part of the Veterans Bureau in the course it followed in attempting to deliver the adjusted service certificate to veteran Brown in June, 1925. The certificate was sent to him by registered mail to the address certified by the Secretary of War pursuant to Section 303 of the Act above quoted. If through an error of the Postmaster non-veteran Brown received the certificate, that was an error that could happen because of the similarity in name and address. But the error gave non-veteran Brown no right or title to the certificate.

The Roxboro bank loaned non-veteran Brown $140 on his sixty-day note and acting as his agent forwarded his application for a Veterans Bureau loan at the same time. It also acted as his agent in designating the Roxboro bank as the address of non-veteran Brown to which the check of $152 was to be mailed. The Roxboro bank had actual contract with non-veteran Brown and had an opportunity to check his identity. On the strength of the Roxboro bank's guarantee of his endorsement on the check the other banks, including this defendant, also guaranteed his endorsement, and the Treasurer of the United States paid the check. The express guarantee of prior endorsements was in effect the same as an unrestricted endorsement. United States v. Guaranty Trust Co., 293 U.S. 340, 349, 55 S.Ct. 221, 79 L.Ed. 415, 95 A.L.R. 651.

But there is a further question to be decided, as to the effect of the government's delay in giving notice of the forgery to the defendant. It is contended by defendant that through the government's delay in giving notice of the forgery the defendant lost its right of recourse against the Roxboro bank and Durham bank and that the facts of this case clearly establish that but for the government's delay in giving notice of the forgery the defendant could have recouped its loss from these banks on their guarantees of non-veteran Brown's endorsement. This is the substance of a special defense pleaded in the answer to the complaint herein. In urging this point the defendant calls the court's attention particularly to the following facts already referred to: In April, 1931, veteran Brown applied a second time to the Veterans Administration for an Adjusted Service Compensation Certificate and on November 3, 1931, delivered to the government his af-

fidavit stating that he had not received the certificate, nor applied for any loan thereon. On April 14, 1932, plaintiff's operative reported to plaintiff all the facts concerning the check involved in this suit. Over three and a half years thereafter, on November 18, 1935, the government for the first time notified the defendant of the claimed irregularity in the check and demanded reimbursement from the defendant of the face amount thereof. At that time both the First National Bank of Roxboro, North Carolina, and the First National Bank of Durham, North Carolina, were insolvent and had no funds with which to pay the check. Up to September 13, 1932, the First National Bank of Durham, North Carolina, maintained an account with the defendant in which the credit balance at all times exceeded the face amount of the check in question and on said date defendant sent its check to that bank for $2,360.-28, concluding that bank's relationship with the defendant. On the basis of these facts the defendant urges plaintiff's laches as a bar to the claim—contending that plaintiff's unreasonable and inexcusable delay resulted in prejudice and injury to the defendant and precludes the plaintiff from setting up the forgery. The government seeks to meet this charge by invoking the principle that laches is not imputable to the United States.

While it is true that "laches is not imputable to the government, in its character as sovereign, by those subject to its dominion", it is equally true that "if it comes down from its position of sovereignty, and enters the domain of commerce, it submits itself to the same laws that govern individuals there". Cooke et al. v. United States, 91 U.S. 389, 398, 23 L.Ed. 237. The government in this case has become a party to commercial paper. As such it has abandoned its character of sovereign and has submitted itself to all the responsibilities of a private individual in like position. The government is not asserting a right which is vested in it as a sovereign government. It is asserting a claim which any private citizen as maker of a check might assert under similar circumstances. It therefore loses that immunity which the sovereign might otherwise possess and "does business on business terms", as was said by the United States Supreme Court in United States v. National Exchange Bank of Baltimore, 270 U.S. 527, at page 534, 46 S.Ct. 388, at page 389, 70 L.Ed. 717. "As against the

United States, the rights of the holder of its checks drawn upon the Treasurer are the same as those accorded by commercial practice to the checks of private individuals". United States v. Guaranty Trust Co., 293 U.S. 340, at page 350, 55 S.Ct. 221, at page 226, 79 L.Ed. 415, 95 A.L.R. 651.

While the delay in bringing notice of the forgery to the defendant bank was not as long in the instant case as it was in United States v. Clinton National Bank, C.C., 28 F. 357, 358, the facts are very similar. In the last mentioned case the court said: "Do the facts stated constitute a defense? That no mere statute of limitations will bar a claim for money due the government is settled. United States v. Thompson, 98 U.S. 486 [25 L.Ed. 194]. But the defendant contends that the government, dealing in commercial paper, is subject to the same rules and obligations that control individuals in like transactions, and that, as between individuals, 'it is undoubtedly necessary that the maker, acceptor, or other party who demands restitution of money paid under a forged indorsement, or under a forged signature of the drawer of a bill, should make the demand without unnecessary delay.' 2 Daniel, Neg.Inst. § 1371. The first of these two propositions was decided in Cooke v. United States, 91 U.S. 389 [23 L.Ed. 237]. See, also, United States v. [Central] National Bank [D.C.,] 6 F. 134.

The second seems to be sustained by the common voice of the authorities. See, in addition to 2 Daniel, Neg.Inst. cited supra, 2 Pars. Notes & Bills, 598, and cases cited in notes to text of both authors. The principal cases cited by counsel for the government are those in which the liability of the defendant, being absolute, fixed, and constant, the question has been one purely of the statute of limitations, while in the case at bar the right of recovery is conditioned on promptness in giving notice. The distinction between the two is obvious."

The government leans heavily upon United States v. National Exchange Bank of Providence, 214 U.S. 302, 29 S.Ct. 665, 53 L.Ed. 1006, 16 Ann.Cas. 1184, wherein the government recovered against a bank on pension checks, the proceeds of which were received by the bank, where the names of the payees had been forged, the court holding that the right to recover was not conditioned upon either demand or the giving of notice of the forgery. Counsel for the government in urging this case in

support of its position on the question of laches has lost sight of the fact that while the mere right of action is not affected by delay in demand or notice, a defendant otherwise liable because of money obtained upon a forged instrument may defend upon the ground that delay in notice or demand after discovery of the forgery has worked an injury to him.

In Ladd & Tilton Bank v. United States, 30 F.2d 334, the Circuit Court of Appeals for the Ninth Circuit held that when the government, after discovering forgery of endorsements on victory notes for which it had theretofore exchanged coupon bonds, failed to notify the bank, effecting the exchange, of such forgeries for a period of approximately nineteen months, resulting in injury to the bank by reason of the insolvency and liquidation of another bank from which it had received the notes, the government's failure to give timely notice of the forgery constituted a defense.

In that case the court refers at great length to United States v. National Exchange Bank, supra, and explains the limited effect of that case. United States v. National Exchange Bank, supra, is not controlling on the facts of the case at bar. Here we have a clear showing that the government not only delayed unreasonably in bringing notice of the forgery to the defendant's attention, but we have an equally clear showing that such delay resulted in defendant's loss of recourse and indemnity. As was said in Ladd & Tilton Bank v. United States, supra, at page 337: "The decision of the Supreme Court in the National Exchange Bank Case, if it does not expressly approve the rule that in a case of implied warranty failure to give notice where there is a resultant injury is a defense to the action, by inference at least would seem to have approved such rule."

In United States v. First National Bank & Trust Co. of Oklahoma City et al. reported in D.C., 17 F.Supp. 611, 613, the United States District Court for the Western District of Oklahoma had occasion to pass upon a state of facts somewhat similar to those in the case at bar. In finding for the defendant that court based its conclusion primarily upon the fact that the government "set in motion the machinery which resulted in the loss" but added as a further reason for the result reached that "notice should have been given without unnecessary delay after discovery of the

fraud, to enable the bank to pursue any remedy it might have against the forger or indorsers". The delay in that case was approximately thirteen months. Here the delay was at least three and a half years.

■ I am of the opinion that the government, on the facts of this case, is subject to the defense of laches and that such defense is a complete bar to the government's claim.

The defendant is entitled to judgment dismissing the complaint on the merits, with costs. This opinion shall stand as the Court's findings of fact and conclusions of law.