## UNITED STATES v. FIRST NAT. BANK OF CHICAGO.

### No. 8274.

Circuit Court of Appeals, Seventh Circuit.

Nov. 18, 1943.

J. Albert Woll, of Chicago, Ill., Paul A. Sweeney, Department of Justice, of Washington, D.C., and Francis M. Shea, Asst. Atty. Gen. (George F. Foley and Phyllis J. Campbell, Attys., Department of Justice, both of Washington, D. C., and Austin Hall and W. Sylvester White, Jr., Asst U. S. Attys., both of Chicago, Ill., of counsel), for appellant.

C. Edward Dahlin and Ralph J. Mohan, both of Chicago, Ill., for appellee.

Before MAJOR and KERNER, Circuit Judges, and LINDLEY, District Judge.

KERNER, Circuit Judge.

Plaintiff brought this action against the First National Bank of Chicago to recover the amounts disbursed in payment of twenty-two checks. The action is based on the guaranty of prior endorsements which defendant stamped on each check. The payee's endorsement on each of these checks was forged. After the parties had entered into a stipulation of facts, plaintiff's motion for summary judgment was denied. Defendant's motion for judgment was granted. This appeal followed.

The checks in suit were pension checks[1] having the same payee, Louis Woodall, who had died on November 11, 1927, prior to the issuance of any of them. The checks were drawn on the Treasurer of the United States and were collected through plaintiff's fiscal agent, the Federal Reserve Bank of Chicago. Various agents of the plaintiff drew the checks: ten by E. E. Miller, Disbursing Clerk for the Department of the Interior between December 4, 1927, and July 4, 1930; ten by J. B. Schommer, Disbursing Clerk for the Veterans' Administration, nine between September 4, 1931 and September 4, 1932, and one on March 31, 1934; one by J. B. Schommer, Disbursing Clerk of the Division of Disbursement, Treasury Department, on April 30, 1934; and one by G. F. Allen, Chief Disbursing Officer of the Treasury Department, on July 31, 1934.

None of these checks were presented directly to defendant. They came to it for collection. On seventeen of the checks, the Reliance Bank and Trust Company,

---

[1] In the amount of $90, $95, or $100.

Chicago, Illinois, or its predecessor, the Reliance State Bank of Chicago, were prior endorsers. That bank closed on July 22, 1932, and all depositors and all other creditors whose claims were not filed before October 15, 1932, were barred. The Madison-Kedzie Trust and Savings Bank, Chicago, prior endorser on one check, was closed on March 16, 1933. The Liberty Trust and Savings Bank, Chicago, was a prior endorser on one check; its account with defendant was closed about December 29, 1932. John Blanton, an endorser on eight checks, died in 1934 and the balance of his estate ($754.28) was distributed as a child's award on April 27, 1934. Lulu Franklin, Charles Porter and Edna Porter, who were either prior endorsers or witnesses on a number of checks, did not possess any means to respond to any claim against them on March 27, 1935. W. H. Smith & Co., one of the endorsers on one check, was solely owned by W. H. Smith, who died in the year 1932 leaving no assets.

The Liberty Bank of Chicago was a prior endorser on two checks. It was succeeded by the Liberty National Bank, Chicago, Illinois, on August 10, 1934, and about that date, the account of the Liberty Bank of Chicago with defendant was transferred to the account of the Liberty National Bank, Chicago, Illinois. The Merchants Currency Exchange, Chicago, a prior endorser on one check, remained active.

Each of the checks bore the forged signature "X Louis Woodall" plus one or more succeeding endorsements at the time defendant received them. On various dates between December 9, 1927, and August 4, 1934, defendant collected the checks, crediting the account of the transferor, i. e., the immediate prior endorser; it did not keep the proceeds. Defendant endorsed the checks with the usual endorsement stamp, making the checks payable to the order of any bank and guaranteeing all prior endorsements. It is on this that plaintiff seeks to predicate defendant's liability. Each check, immediately after payment by the Federal Reserve Bank of Chicago, was delivered to the Treasury Department.

About December 18, 1927, an undertaker, M. J. Suerth, filed a claim, together with a death certificate, with the Veterans' Bureau for burial charges of Louis Woodall, the payee named in all of the checks involved in this action. May 14, 1928, a check in the amount of $106 drawn on the Treasurer of the United States by William H. Holmes, Disbursing Clerk for the Veterans' Bureau, was mailed to Suerth in payment of the allowance for the burial of Louis Woodall. January 19, 1928, the Awards Division, Reimbursement Section of the Veterans' Bureau received an affidavit executed by Mrs. Lulu Franklin in support of a burial claim and also an itemized bill, bearing the heading of Frank Howard & Co. Undertakers and Embalmers, directed to Mrs. Lulu Franklin for burial of L. Woodall, in the total amount of $47. This bill bore on its face the notation, "Received payment in full from Lulu Franklin," and was signed "Frank Howard."

Prior to July 21, 1930, the Bureau of Pensions, a branch of the Department of Interior, was charged with the administration of the pension laws of the United States governing benefits to veterans of the military services other than for services during the first World War. The Veterans' Bureau was established in 1921 as an independent bureau under the President; one of its functions was to pay the burial expenses of a veteran. July 21, 1930, by Executive Order No. 5398, 38 U.S.C.A. § 41 note, the Bureau of Pensions and the Veterans' Bureau were consolidated into the Veterans' Administration, and the functions, personnel and records of each were transferred to the Administration. The folder of the Veterans' Bureau relating to the death benefits of Louis Woodall was not combined with that of the Bureau of Pensions relating to Woodall until August 29, 1934, at which time it was noticed that pension checks had been improperly issued in the name of Louis Woodall since November, 1927. October 5, 1934, the matter was referred to the Treasury Department for investigation, and thence, on December 7, 1934, to the Claims Division, General Accounting Office. March 26, 1935, the General Accounting Office advised the Federal Reserve Bank of Chicago of the fact that Louis Woodall had died on November 11, 1927, and enclosed photostatic copies of the checks. Thereupon, on March 27, 1935, the Federal Reserve Bank advised defendant of the facts, and shortly thereafter made a demand upon defendant for the return of the sums paid upon the checks which was refused. This was the first notice defendant had of the forgeries or of the death of Louis Woodall.

Plaintiff contends that it was not chargeable with knowledge of Woodall's death and hence was not guilty of undue delay in notifying the defendant of the forgery.

In elaborating this contention, plaintiff argues that the Veterans' Bureau and the Pension Bureau were separate and distinct entities at the time the former received the death certificate and claims for funeral expenses, so that notice to the one was not notice to the other. Plaintiff argues further that since the United States, being a body sovereign, is similar to a corporation in that it is incapable of actual knowledge except that which its officers and agents possess, the only knowledge that it could have had was imputed knowledge, and asserts in its brief that "* * * to hold that in the conduct of its unrelated affairs the United States is chargeable with knowledge of facts disclosed in records [such as those of the Social Security Board, Census Bureau, etc.] would place an intolerable burden upon the Government in the successful conduct of its business. Practical considerations of public policy compel the rejection of any theory which undertakes to attribute notice to the Government solely because some bureau or department of the Government has a record some place which contains information subsequently discovered, to be of relevance."

This elaboration of plaintiff's argument begs the question. The real issue is whether the matters involved here were unrelated so that on receiving the death certificate, no duty rested upon the Veterans' Bureau to communicate that fact to the Pension Bureau. Because plaintiff assumes in its argument that they were unrelated, it assumes that which it is seeking to establish. Hence its argument is not persuasive. Many of the authorities plaintiff cites are distinguishable for the same reason.

We think that the Government had knowledge of Woodall's death, and that the payment of funeral expenses and issuance of pension checks to an identical person are so related that each department handling the transactions is chargeable with the same knowledge. The actual notice of death received by the one bureau was so important to the other that there was a plain, legal duty to communicate such information to the other, and in default thereof it must be considered to have constructive notice. Woodall's death, as far as his legal relations with the Government were concerned, provided a basis for an application for reimbursement for funeral expenses, and completely and effectively terminated any right to receive a pension. When the reimbursement claim for funeral expenses was received by the Veterans' Bureau, the knowledge which that Bureau acquired should have been communicated to the Pension Bureau. By the then existing statute, Act March 4, 1909, 35 Stat. 1058, 38 U.S.C.A. § 97, the Commissioner of Pensions had jurisdiction of all claims for funeral expenses of Civil War pensioners, and the nature of the claim itself suggested the department which should receive notice. Common experience suggests that in many instances where the Government is called upon to pay a veteran's funeral bill the veteran was receiving pension checks during his lifetime; hence notice of Woodall's death should have been given to the Pension Bureau.

Plaintiff contends that no duty rested on the Veterans' Bureau to inform the Pension Bureau, because there was no legislative enactment requiring Government officers, agents, and employees to interchange such information. True, but we cannot agree that a statute was necessary to establish such a duty. It is reasonable to conclude that upon the payment of claims for funeral expenses, the Veterans' Bureau would be greatly interested in checking with its related department of pensions to see that such pension payments were terminated. The exercise of reasonable care by a businessman would suggest that the death be reported to the Pension Bureau. Since the United States does business on business terms, United States v. National Exch. Bank of Baltimore, 270 U.S. 527, 534, 46 S.Ct. 388, 70 L.Ed. 717, and its agent failed to give such notice, the Pension Bureau is chargeable with knowledge which it should have received. Any other holding would allow the Government as principal to benefit by its agent's or employee's negligence. The administrative aspects of this problem are not for this court but for Congress, United States v. National Exch. Bank of Baltimore, 4 Cir., 1 F.2d 888, 890, and possibly Congress could have granted relief from the necessity of giving notice to the Pension Bureau of a veteran's death, but no such statute was in effect at the time Woodall died.

We do not regard the war risk insurance cases[2] cited by plaintiff in support of its contention that the Pension Bureau had no notice of the death of Woodall, as controlling. Those cases are distinguishable on their facts. Moreover, the insured's misrepresentation in each of them, which came to light from information either in the records of another department or in the same department involved in the payment of the death claim and thus was claimed to be notice preventing the beneficiary from receiving the insurance money on the subsequent death of the insured, did not amount to forceful notice of the simultaneous extinguishment of a right as did the death certificate of Woodall in this case. In other words, plaintiff's agent who learned of Woodall's death ipso facto knew that if he had been previously receiving pension checks, he no longer was entitled to receive them, and it was his duty, or that of his superior, to see that notice was given to the disbursing authority to cease sending the checks, whereas in those cases, the information on the blank that applicant was free from disease did not carry on its face a warning that a previously existing right had ceased to exist. On the contrary, in those cases it was only subsequently that the misrepresentation became evident. And so far as the employee who received the application blanks in those cases knew, the representations made therein were true. On the basis of United States v. Kelley, 9 Cir., 136 F.2d 823, it would seem that a section of a department may not be segregated from the rest of the department, and notice to it is notice to the whole department. In the instant case, the departments were so closely related that facts, such as deaths, reported to one were necessarily important to the other. Accordingly, the so-called separate departments were similar to different sections of a single department. Three years after Woodall's death, they were consolidated into the Veterans' Administration which further tends to show their close relation.

The cases cited by plaintiff do not hold that the Government is not bound by the negligence of its employees where it becomes a party to commercial paper. On the contrary, the authorities are uniform in holding that the Government assumes all the responsibilities of private persons under similar circumstances when it issues commercial paper. Cooke v. United States, 91 U.S. 389, 23 L.Ed. 237; United States v. National Exch. Bank of Baltimore, 270 U.S. 527, 46 S.Ct. 388, 70 L.Ed. 717; United States v. Guaranty Trust Co. of New York, 293 U.S. 340, 350, 55 S.Ct. 221, 79 L.Ed. 415, 95 A.L.R. 651; Clearfield Trust Co. v. United States, 318 U.S. 363, 369, 63 S.Ct. 573, 87 L.Ed. ——.

One of these responsibilities is that the drawee on learning of the forgery must give prompt notice to prior parties. If the drawee fails to do so and damage results, recovery by the drawee is barred, Clearfield Trust Co. v. United States, 318 U.S. 363, 369, 63 S.Ct. 573, 87 L.Ed. ——; and "The fact that the drawee is the United States and the laches those of its employees are not material." Id., 318 U.S. at page 369, 63 S.Ct. at page 576, 87 L.Ed. ——. The decision in the instant case hinges on when the Government learned of the forgery. Plaintiff insists that it did not learn that the payee's endorsements were forgeries until August, 1934, when the folder of the Veterans' Bureau relating to the death benefits of Louis Woodall was combined with that of the Bureau of Pensions relating to Woodall. Hence, plaintiff argues, there was no delay after the forgery was discovered which resulted in damage to defendant for the reason that the damage had already occurred. We cannot agree with plaintiff's view, for, as we have explained above, plaintiff must be held to have had knowledge of Woodall's death long before 1934. Even plaintiff concedes that defendant was damaged because prior endorsers that would have been good for the money prior to the depression of 1931 through 1933, were no longer solvent. For example, defendant acted as agent for the Reliance Bank & Trust Company, or its predecessor, the Reliance State Bank, in collecting checks aggregating $1,610. This bank was closed on June 18, 1932. Hence this bank was closed some five years after the Government had Woodall's death certificate on file and two years after the consolidation of the Veterans' Bureau and the Pension Bureau. Other checks had prior endorsements of other banks which were good for the claims in the early thirties but by reason of failures or other weakened financial condition were not available to

---

[2] Halverson v. United States, 7 Cir., 121 F.2d 420; United States v. Riggins, 9 Cir., 65 F.2d 750; United States v. De-pew, 10 Cir., 100 F.2d 725; Jones v. United States, 5 Cir., 106 F.2d 888.

defendant when it received notice from plaintiff in 1935. It is clear that on 19 of the checks no notice of the forgeries reached defendant until defendant had lost its recourse against prior endorsers thereon. Hence the damage occasioned by the delay was clearly established, and the case falls within the rule laid down in the Clearfield Trust Co. case, that a drawee who does not give prompt notice, on learning of the forgery, may not recover if damage results from the delay.

In the Clearfield case the Supreme Court cited with approval United States v. National Rockland Bank, D. C., 35 F.Supp. 912, which is similar to the case at bar. There, the plaintiff had received and filed in its records concerning the veteran, a death certificate. Checks were issued in the veteran's name, and his name, as payee, was forged to them. The defendant bank had no notice of the payee's death for several years after the United States had knowledge of the forgeries. Since the failure to give such notice destroyed the bank's opportunity to seek indemnity from prior endorsers because of their changed financial circumstances, the Government was precluded by laches from recovering the amount of the drafts. Also compare United States v. National City Bank of New York, D. C., 28 F.Supp. 144, 150.

 Nor do we think the cases urged by plaintiff are controlling here. The Supreme Court carefully explained United States v. National Exch. Bank, 214 U.S. 302, 29 S.Ct. 665, 53 L.Ed. 1006, 16 Ann. Cas. 1184, in the Clearfield Trust Co. case, 318 U.S. 363, 369, 63 S.Ct. 573, 87 L.Ed. ——, and the case of Ladd & Tilton Bank v. United States, 9 Cir., 30 F.2d 334, is perfectly consistent with our view. Since in the instant case the Government had knowledge of Woodall's death, it cannot be said that the forgery was discovered in August, 1934. "Discovery" means finding something previously unknown. If the Government already knew of the forgery either in 1927 when the death certificate was received by the Veterans' Bureau and notice should have been given to the Pension Bureau, or in 1930 when the bureaus were consolidated, then obviously the forgery could not be "discovered" in 1934. A dead man cannot endorse checks.

Equitable considerations also dictate that judgment in this case should be for the defendant. Defendant was in no way bene-fited by collecting these checks. It retained no part of the proceeds collected from the plaintiff.

Finally, plaintiff contends that since three checks have a prior endorser on them which has not been shown to be insolvent, namely, the one on which the Merchants Currency Exchange is a prior endorser and the two on which the Liberty Bank of Chicago is a prior endorser, it should be allowed to recover on them. However, we think the cases cited to support this position are all distinguishable in that in none of them did it appear that the Government had actual knowledge of the death of the payee when it issued the checks. Having such knowledge, we think the United States was culpably negligent in issuing them. Having set in motion the machinery which resulted in the loss, it may not now recover from the defendant thereon. Compare United States v. First Nat. Bank & Trust Co. of Oklahoma City, D. C., 17 F.Supp. 611, 613; Security-First Nat. Bank of Los Angeles v. United States, 9 Cir., 103 F.2d 188, 191.

Accordingly, the judgment of the District Court is affirmed.