**UNITED STATES v. MICHAELSON et al.**

**No. 849.**

District Court, D. Minnesota,
Fourth Division.

Jan. 13, 1945.

Victor E. Anderson, U. S. Atty., and James J. Giblin, Asst. U. S. Atty., both of St. Paul, Minn., for plaintiff.

Jay W. Smith and T. M. Thomson, both of Minneapolis, Minn., for defendant Philomena Flannery Michaelson.

Shearer, Byard & Trogner, of Minneapolis, Minn., for corporate defendants.

NORDBYE, District Judge.

The above-entitled cause came on for trial before the Court without a jury.

The facts necessary to an understanding of the case appear to be the following: Philomena Flannery married one Bernard Flannery, a veteran of the first World War, in 1923. He died in 1924 and, as his wife, she drew a pension of $30 per month until February 28, 1937, when the payments were increased to $37.50 per month, and which payments continued until June, 1939. It was then that the Government ceased to make any further payments and later instituted this action contending that Philomena Flannery had become the common law wife of one Raymond E. Michaelson during the year 1927. Michaelson died on December 13, 1943.

This action seeks to recover the amount of the pension checks paid from May 31, 1937, to June 30, 1939, on the grounds that Philomena Flannery was not entitled to recover any of the pension money after she married Michaelson. It is conceded that her right to any pension payments ceased upon her remarriage, if that has been established. The action against the Hennepin Federal Savings & Loan Association and the Hennepin Realty & Insurance Corporation is bottomed on the claim that these defendants cashed all of these checks during the period referred to and knew, or should have known, that the widow of Bernard Flannery had contracted a common law marriage with Raymond E. Michaelson and therefore was not entitled to any of the pension payments reflected in these checks. The action seeks to recover from the Hennepin Realty & Insurance Corporation checks cashed by it on August 14, 1937, totaling $60, and judgment is sought against the Hennepin Federal Savings & Loan Association by reason of its cashing twenty-four pension checks between the dates mentioned totaling some $879.25. Recovery against Philomena Flannery Mi-

chaelson is sought in the full amount of the twenty-six checks. The Hennepin Federal Savings & Loan Association and the Hennepin Realty & Insurance Corporation have the same board of directors and officers, and any notice regarding the remarriage of the payee of these checks was received by both defendants at the same time and under the same circumstances and therefore the same principles apply to both defendants; hence, for convenience, when referring to both defendants, they will be designated as the corporate defendants.

■ The principles which governed common law marriages in the State of Minnesota prior to the adoption of the 1941 statute, which abolished common law marriages, are well settled. If persons were competent to enter into a marriage contract and agreed between themselves in the present tense to become husband and wife, the marriage was complete. Cohabitation added nothing to the marriage contract, except that it might constitute evidence of the contract. Guptil v. E. O. Dahlquist Contracting Co., 1936, 197 Minn. 211, 266 N.W. 748. As stated in Ghelin v. Johnson, 186 Minn. 405, 243 N.W. 443, 445: "Where there is no proof of any express written or oral agreement, there must be evidence of cohabitation as man and wife, or the assumption openly of marital duties and obligations, continued for such time and to such an extent as to reasonably sustain the conclusion or inference that the parties have agreed to become and be husband and wife. The cohabitation and conduct must be of some continuance and such as is usual between persons lawfully married." And further: "General reputation that the parties are married is not alone sufficient to prove marriage, but may be shown in connection with cohabitation and other circumstances."

■ The evidence in this case is overwhelmingly persuasive that Philomena Flannery and Raymond Michaelson entered into a common law marriage some time in the year 1927. Beginning with that year, these parties openly lived together as husband and wife in the same dwelling, and in all of their relations with other people in the community they held themselves out to be husband and wife. This relationship and conduct continued without interruption until the parties were advised that a government investigation had been launched looking to the right of Philomena Flannery Michaelson to receive the pension checks as the unremarried widow of Bernard Flannery. But not only did the parties cohabit as husband and wife, and not only were they known in the community for some twelve years as Mr. and Mrs. Michaelson, but all of their business transactions were carried on by them as husband and wife. These business deals and incidents were all carried on in each other's presence and strongly support the Government's position in this proceeding. For instance, beginning with the year 1927, the Michaelsons were operating a tavern near Lake Minnetonka, where they were known to their customers and to the people in the community as husband and wife. In January, 1935, they opened a joint checking account in the State Bank of Mound in the name of Philomena Michaelson and R. E. Michaelson, and the signature card in the bank bore the signature of each party as above stated. The local banker and the clerks in the bank were led to believe by them that they were husband and wife, and they always referred to them as Mr. and Mrs. Michaelson. In 1935, the Michaelsons applied to this bank for a loan on the property on which the tavern was being conducted. The property was in the name of Raymond E. Michaelson. The loan was granted and the mortgage in the amount of $3,000, dated April 23, 1935, was given to the bank and signed by Raymond E. Michaelson and Philomena Flannery Michaelson, husband and wife. The signatures on the mortgage are "Raymond E. Michaelson" and "Philomena Flannery Michaelson." The acknowledgment before the notary public refers to them as "Raymond E. Michaelson and "Philomena Flannery Michaelson, his wife." On November 25, 1936, the Michaelsons rented a safety deposit box at the State Bank of Mound. On the card the renter was designated as "Raymond E. Michaelson and Mrs. Raymond E. Michaelson, jointly or the survivor of either." The card was signed in each other's presence "Raymond Earl Michaelson" and "Mrs. Michaelson." The signature of Mrs. Michaelson appearing on the card is that of the defendant herein.

An account was maintained with the Hennepin Federal Savings & Loan Association in the name of Philomena Flannery, which had been so maintained for many years and was carried in that name in the year 1937. It was in that year that Raymond E. Michaelson made an application to the Association for a first mortgage loan on the tavern property. This

was the property on which the State Bank of Mound had taken a mortgage in April, 1935. The abstract of title which was examined by the Association indicated that the mortgage to the State Bank of Mound bore the signature of its depositor known as Philomena Flannery, but in which mortgage she had signed as Philomena Flannery Michaelson, wife of Raymond E. Michaelson. The Association required that the mortgage to be given to it should likewise bear the signature of Philomena Flannery Michaelson, the wife of Raymond E. Michaelson, and the mortgage was signed "Raymond E. Michaelson" and "Philomena Flannery Michaelson," and the acknowledgment referred to them as husband and wife. This mortgage was drafted by the Association, and in the body of the mortgage it recites that Raymond E. Michaelson and Philomena Flannery Michaelson, husband and wife, are the mortgagors. The acknowledgment was taken before a notary public in the office of the Association, and recites: "On this first day of June, A. D. 1937, before me, a Notary Public, within and for said County and State, personally appeared Raymond E. Michaelson and Philomena Flannery Michaelson, husband and wife, to me known to be the persons described in and who executed the foregoing instrument, and acknowledged that they executed the same as their free act and deed."

On or before October 25, 1937, a retail credit report came to the attention of the Association. This report pertained to Raymond E. Michaelson, and that such report put the corporate defendants on notice as to the remarriage status of the person who had done business with them as Philomena Flannery seems strikingly evident. It reads in part: "Raymond E. Michaelson was formerly in the illegal liquor business. He has for the past four years been living with a common law wife. She is the widow of a man who was shot in bed under very peculiar circumstances, informants believing that he had been connected with gangster activities. Mr. Michaelson leased the property in question for a season, but is now operating it himself. He handles legal 3.2 beer sold at the bar and it is stated to be possible to buy hard liquor in the establishment if one is known. The establishment is on the main street of the town and is operating under the trade style of 'Mike's.' Mr. Michaelson's common law wife is actually the head of the business and she maintains close supervision over

him, controls his actions and controls the spending and paying out of moneys. Mr. Michaelson will, whenever his wife is not with him, become intoxicated for periods of a day or two at a time. One year ago he was intoxicated and was hit by a truck during her absence, and was laid up for practically the whole season. His common law wife obtains a pension as long as she remains technically single."

This credit report came to the attention of the corporate defendants when they were cashing the checks in question, which read: "Pay in dollars......$30.00......to the order of Mrs. Philomena Flannery, as unremarried widow of Bernard Flannery, c/o D. E. LaBelle, 632 Security Building, Minneapolis, Minn." All of the checks cashed bore the designation in the corner that the object for which they were drawn pertained to "Veterans." It will be noted that the credit report above quoted states: "His common law wife obtains a pension as long as she remains technically single." Moreover, it appears from the evidence that during 1937 the corporate defendants became concerned about the cashing of these pension checks in view of the restriction which apparently governed the right of the payee to obtain the proceeds thereof. They assert that they questioned Mrs. Flannery about her remarriage and contend that she denied that she was the wife of Michaelson. But notwithstanding that they expressed concern over their right to cash the checks under the circumstances, and went so far as to consult their attorney about the propriety of cashing such checks, they continued to do so, although they admit that their attorney advised them that the cashing of the checks was "a business hazard." Furthermore, on June 19, 1939, the Michaelsons negotiated another mortgage with the Association on property which was registered in the name of Philomena Flannery. This was the so-called lake property and included the lake cottage where the Michaelsons had for years been living as husband and wife. In so far as the record shows, no other mortgage had been given on this property and consequently there was no precedent as to any requirement of any signature of the spouse of the owner. The Association, however, drafted the mortgage on its own form and recites that the mortgagors are "Philomena Flannery Michaelson (formerly Philomena Flannery) and Raymond E. Michaelson, wife and husband." The notary who notarized the

mortgage in 1939 in the office of the Association is the same notary who took the acknowledgment in 1937, and this acknowledgment recites: "On this 19th day of June, 1939, before me, a Notary Public, within and for said County and State, personally appeared Philomena Flannery Michaelson (formerly Philomena Flannery), and Raymond E. Michaelson, wife and husband, to me known to be the persons described in and who executed the foregoing instrument, and acknowledged that they executed the same as their free act and deed."

In addition, it may be pointed out that, in June, 1941, Mrs. Michaelson was a patient in the hospital at Wayzata, Minnesota. She was admitted as Mrs. R. E. Michaelson, and her history sheet notes that she was a married woman and a record was made in the hospital notes as to a visit from her husband. In fact, as late as September 12, 1943, and after this action was commenced, she was a patient at the General Hospital in the City of Minneapolis, and although she was registered as Philomena Flannery, nee Michaelson, she signed her discharge as "Stella Michaelson", and the record indicates that her nearest relative was her husband, Raymond, residing at 1106 Chestnut Avenue, Minneapolis, where the Michaelsons resided at that particular time.

■ Reference is made by the defendants to Michaelson's enlistment in the Minnesota Defense Force on December 15, 1942, wherein he referred to himself as a single man, and also to his draft questionnaire in July, 1942, where he also noted his status as single. But these documents, assuming that they constitute competent evidence, are not entitled to a great deal of probative value. Such declarations were made long after the investigation herein was commenced, and it was to the interest of both of the Michaelsons to deny any common law relationship in view of the claim of the Government that Mrs. Michaelson was not entitled to any of the pension payments, since her common law marriage to Michaelson. Moreover, it is to be doubted that such documents constitute competent evidence. They are not part of the res gestae. They were not executed in the presence of Mrs. Michaelson. At best, they are self-serving documents and are not declarations against interest. See, Ghelin v. Johnson, 186 Minn. 405, 243 N.W. 443.

■ It follows, therefore, that the direct and circumstantial evidence fully supports the Government's contention that a common law marriage within the purview of the Minnesota decisions was contracted by and between Philomena Flannery and Raymond Michaelson during the year 1927 and that such marriage was not terminated until Michaelson's death on November 13, 1943. The Government's right to recover the payments from Mrs. Michaelson which were made to her under a mistake of fact seems uncontrovertible.

This brings us to the question as to the right of recovery against the corporate defendants. In its brief, plaintiff states that the action is predicated "upon written and implied contracts of guaranty and for money paid by mistake." The amended complaint appears to be sufficiently broad to embrace both theories. The only guaranties, however, which can arise from these checks, which are negotiable instruments, are the ones which arise by virtue of the corporate defendants' endorsements thereon. On some of the instruments is found the endorsement: "Pay to the order of Midland National Bank and Trust Company, Minneapolis, Minn., Hennepin Federal Savings and Loan Assn., O. J. Hanson, Treasurer." On the remainder of the instruments is found the same endorsement except that it is made by the Hennepin Realty and Insurance Corporation.

■ Federal, not state, law governs this case. Clearfield Trust Co. v. United States, 1942, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838; National Metropolitan Bank v. United States, 323 U.S. ——, 65 S.Ct. 354. As stated in the Clearfield case, 318 U.S. at page 366, 63 S.Ct. at page 575, 87 L.Ed. 838: "* * * The rights and duties of the United States on commercial paper which it issues are governed by federal rather than local law. When the United States disburses its funds or pays its debts, it is exercising a constitutional function or power."

■ The Government relies chiefly upon United States v. National Exchange Bank, 1908, 214 U.S. 302, 29 S.Ct. 665, 53 L.Ed. 1006, 16 Ann.Cas. 1184; Clearfield Trust Co. v. United States, supra; and National Metropolitan Bank v. United States, supra, in support of its recovery claim. These cases proceed upon the theory that he who presents a check to the United States for payment warrants

that he has title to it and the right to receive the payment. The corporate defendants here did not possess good title to the checks in question. As noted in the preceding part of this opinion, the corporate defendants knew of sufficient facts to apprise them that Mrs. Michaelson was not entitled to these checks. By her silence, Mrs. Michaelson represented to the United States that she had not remarried and therefore was entitled to the checks in question. It seems too well settled for argument that one who obtains a check through fraudulent representations to the drawer does not receive a good title to the instrument. 10 C.J.S., Bills and Notes, § 496, p. 1091. In view of the corporate defendants' knowledge that Mrs. Michaelson was not entitled to the checks, they obviously received only the title which she possessed, and that title was defective. To be a holder in due course and thereby receive a better title than the endorser, the endorsee cannot take with knowledge of the endorser's bad title. Those principles also are well settled.

■ Although the cases relied on by the Government—United States v. National Exchange Bank, supra; Clearfield Trust Co. v. United States, supra; and National Metropolitan Bank v. United States, supra —pertain to forgery situations, the general circumstances herein seem sufficiently analogous and the language sufficiently broad to invoke the liability in the instant case. There was at least an implied warranty of title at the time these checks were presented for payment by the defendants' agent to the Federal Reserve Bank. Clearfield Trust Co. v. United States, supra, Note, 318 U.S. at page 368, 63 S.Ct. 573, 87 L.Ed. 838. Cf. Bryant v. McGowan, 151 Pa.Super. 529, 534, 30 A.2d 667, 670; United States v. Liberty Ins. Bank, D. C., 26 F.2d 493; United States v. Peoples-Pittsburgh Trust Co., D. C., 34 F.Supp. 230.

And, in any event, the money paid by the Government on the checks in question seems recoverable by analogy to impostor cases. In those cases, as here, the drawer of the negotiable instrument mistakenly thought that the person to whom the check was issued was the person entitled to the payment represented by the check, and here, as there, the fraudulent failure of the payee to inform the drawer as to the true facts caused the issuance of the checks.

True, in the impostor cases, the majority of the courts hold that the mistake of the drawer prevents him from recovering the amount mistakenly paid from a holder in good faith, but where the holder knew, or should have known, the facts showing that the instrument was given by the drawer under a mistake of fact, such holder could not recover the amount of the check from the drawer. See Jamieson & McFarland v. Hein, 1906, 43 Wash. 153, 86 P. 165; Missouri P. R. Co. v. M. M. Cohn Co., 1924, 164 Ark. 335, 261 S.W. 895; Rosin v. Lawrence Byars Used Car Post, 1942, 30 Ala.App. 576, 10 So.2d 48. The cases cited involved actions by the holder against the drawer before payment, and not actions by the drawer against the holder for recovery of payment. But they serve to establish the rights between the parties, and if the holder under such circumstances cannot recover from the drawer, it must follow that, in absence of laches or estoppel, the drawer can recover money paid to a holder under a mistake of fact where the holder knew, or should have known, that the instrument was given by the drawer under a mistake of fact in the first instance. As pointed out in the annotation in 22 A.L.R. 1228, at 1229, the rights of the parties depend upon the original rights of the holder as against the drawer. So, in the case at bar, it seems clear that, if the corporate defendants could not have recovered the amount of these checks from the plaintiff if the plaintiff had originally refused to pay them, the plaintiff, in absence of estoppel or laches, or some other basis of equity, is entitled to recover the moneys which it paid under a mistake of fact.

■ The corporate defendants claim that laches and estoppel exist here. But the majority of courts have held that the defense of laches is not valid against the claim when the Government is acting in its sovereign capacity. Cooke v. United States, 91 U.S. 389, 398, 23 L.Ed. 237; 30 C.J.S., Equity, § 114, p. 526. True, there is division among the courts as to whether the Government is acting in its sovereign capacity in these pension cases. Compare United States v. First Nat. Bank of Prague, 10 Cir., 1941, 124 F.2d 484, with United States v. National City Bank of New York, D.C.N.Y.,1939, 28 F.Supp. 144, 150, and United States v. National Rockland Bank, D.C.Mass., 1940, 35 F.Supp. 912. But, under

802

the circumstances herein, it does not seem necessary to determine the question as to whether the Government was acting in its sovereign capacity, because the evidence does not show that the Government under the circumstances was not diligent, both in learning of its mistake and in notifying the defendants of the facts. Moreover, the contention of the corporate defendants that plaintiff is estopped to raise its claim that the payee was not entitled to the money is also without support in the evidence. They apparently rest their argument upon plaintiff's silence during the years that the checks were issued and paid, and contend that plaintiff was negligent in not discovering its mistake sooner and in not notifying the defendants of the true state of facts. But in view of the number of pension accounts that the Veterans' Bureau must supervise, and in view of the precautions taken to designate Philomena Flannery on the check as the unremarried widow of Bernard Flannery, and the precautions taken in sending the checks in open-faced envelopes so that the Post Office Department, the letter carriers, and others would know that the checks were intended for the unremarried widow of Bernard Flannery, it would seem that the Government was not negligent in not discovering that she was married sooner than it did discover that fact, and there is no evidence which would justify a finding that the Government did not notify the defendants of the mistake within a reasonable time after discovering the facts.

In the last analysis, it seems clear that the real and proximate cause of the corporate defendants' loss was their own acts. They cashed these checks without reference to the facts which were within their knowledge. They realized the chance that they were taking. They were even advised by their counsel that the cashing of the checks did constitute a business hazard. They did not even take it upon themselves to advise with any government officials to determine whether or not the Government was aware of the reputed common law marriage of the payee of the checks. They are now, under the facts and circumstances herein, in no position to claim laches or estoppel.

 If any additional basis for recovery against the corporate defendants is necessary, it may be pointed out that, under the facts as alleged in the complaint and proved at the trial, the right of recovery against all of the defendants may be bot-

tomed on conversion. Mrs. Michaelson wrongfully applied these checks to her own use. The wrongful taking is to be found in her fraudulent representation to the Government that she was the unremarried widow of Flannery, and hence entitled to this pension money. A taking necessary to a conversion may be accomplished by fraud. Roehrich v. Holt Motor Co., 1938, 201 Minn. 586, 277 N.W. 274. The Minnesota Supreme Court has held that a bank which cashes for a converter a check to which the bank knew, or should have known, the converter was not entitled, is likewise guilty of a conversion. Northwestern Upholstering Co. v. First Nat. Bank and Trust Co., 1935, 193 Minn. 333, 258 N.W. 724. See, also, note, 125 A.L.R. 1194; compare note, 14 A.L.R. 764; note, 69 A.L.R. 1078; note, 131 A.L.R. 874.

Findings of fact and conclusions of law may be presented by the plaintiff. An exception is allowed to the defendants.